# Exhibit Y

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

Z & J LLC d/b/a APPEALTECH,                   :      Index No.: 650620/2018

                               Plaintiff,    :      **AFFIDAVIT OF**

                                             :      **<u>MICHAEL KESTAN</u>**

       -against-                            :

LAURENCE MYNES and COUNSEL PRESS, INC.,       :
GLADSTONE INVESTMENT CORPORATION,             :
GLADSTONE MANAGEMENT CORPORATION,             :
GLADSTONE ADMINISTRATION, LLC and             :
JONATHAN WALLACH                              :

                                 Defendants.   :

-------------------------------------------------------------------------x

State of New York    )
                   )ss:
County of New York  )

      Michael Kestan, being duly sworn, deposes and says:

      1.     I am the President and owner of Z & J LLC d/b/a AppealTech ("AppealTech"), the plaintiff in the above-referenced action, and as such, I am fully familiar with the facts set forth herein.

      2.     I submit this Affidavit in opposition to the motion to dismiss the Amended Complaint filed by Defendants Counsel Press, Inc. ("Counsel Press"), Gladstone Investment Corporation, Gladstone Management Corporation and Gladstone Administration, LLC (collectively, the "Moving Defendants").

      3.     I have reviewed the affidavit sworn to by me on February 7, 2018, submitted by the Moving Defendants as Exhibit B to the Affidavit of Ryan Cronin (NYSCEF Doc. No. 50), and annexed hereto as Exhibit "A".  I hereby ratify all of the statements made in my prior affidavit.

FILED: NEW YORK COUNTY CLERK 01/22/2019 07:45 PM
NYSCEF DOC. NO. 76

INDEX NO. 650620/2018

RECEIVED NYSCEF: 01/22/2019

19-01435-jlg    Doc 5-26    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit Y -
Kestan Aff. 1.22.19.    Pg 3 of 29

4.      On March 5, 2014, Defendant Jonathan Wallach ("Wallach") entered into an employment agreement with AppealTech (the "Wallach Employment Agreement").  A copy of the Wallach Employment Agreement is annexed hereto as Exhibit "B".

5.      On August 4, 2016, Wallach, while an employee of AppealTech, e-mailed an AppealTech client list to Counsel Press. On August 9, 2016, this e-mail with AppealTech's client list was forwarded internally within Counsel Press with a request to input the client list into their system.

6.      On August 3, 2016, Wallach received an e-mail from Keidel, Weldon & Cunningham, LLP regarding a new matter.  However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to Keidel, Weldon & Cunningham, LLP for such matter.

7.      On August 5, 2016, Wallach received an e-mail from Robert Garnsey, an attorney, regarding a new matter for himself and the law firm of Hach & Rose LLP.  Wallach forwarded this e-mail to his personal e-mail account.

8.      On August 9, 2016, Wallach received an e-mail from Sidley Austin regarding a new matter, which was an appellate brief that they needed to have filed on August 22, 2016. However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to Sidley Austin for such matter.  I have since learned that on August 22, 2016, Counsel Press filed this brief for Sidley Austin.

9.      On August 9, 2016, Wallach received a voice-mail from attorney David Gold regarding a new matter.  However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to David Gold for such matter.

2

10.     On August 10, 2016, Wallach received an e-mail from The Kepanis Law Firm regarding a new matter.  However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to The Kepanis Law Firm for such matter.

11.     On August 11, 2016, Wallach received an e-mail from Miranda Sambursky Sloan Sklarin Verveniotis, LLP regarding a new matter and forwarded such e-mail to his personal e-mail account.  However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to Miranda Sambursky Sloan Sklarin Verveniotis, LLP for such matter.

12.     On August 15, 2016, Wallach received an e-mail regarding a new matter from Katsky Korins LLP.  However, Wallach never advised AppealTech of such new matter and thus AppealTech did not provide its services to Katsky Korins LLP for such matter.

13.     On August 15, 2016, Wallach received e-mails from the Law Offices of Eric Churches and Abrams Fensterman regarding new matters.  However, Wallach never advised AppealTech of such new matters and thus AppealTech did not provide its services to these law firms for such matter.

14.     On August 16, 2016, Wallach e-mailed numerous files consisting of AppealTech's confidential and proprietary information to his personal e-mail account.

15.     On August 19, 2016, Wallach sent me an e-mail with a letter of resignation effective immediately.

16.     Within 90 minutes of my receipt of Wallach's letter of resignation, I was forwarded a mass e-mail sent by Counsel Press welcoming back Wallach to their company.  The e-mail I received stated that Wallach's official first day with Counsel Press would be August 29, 2016, although I do not have knowledge whether Wallach started prior to such date.

3

17.    On November 16, 2016, Defendant Laurence Mynes entered into an employment agreement with AppealTech (the "Mynes Employment Agreement").  A copy of the Mynes Employment Agreement is annexed hereto as Exhibit "C".

[Signature Page To Follow]

4

Michael Kestan

Sworn to this 22nd day of January 2019

Notary Public

SONJIA R. RICHARDS
Notary Public, State of New York
No. 03-4998375
Qualified in Bronx County
Commission Expires June 29, 2022

*Signature Page to Affidavit of Michael Kestan*

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- x
                                                                 :
Z & J LLC d/b/a APPEALTECH
                                                                 :    Index No. 650620/2018
                                        Plaintiff,
                                                                 :
            -against-                                                 **AFFIDAVIT OF MICHAEL
                                                                 :    KESTAN IN SUPPORT**
LAURENCE MYNES and COUNSEL PRESS INC.,
                                                                 :
                                        Defendants.              :
---------------------------------------------------------------- x

STATE OF NEW YORK    )
                     ) s.s.:
COUNTY OF NEW YORK   )

    I, **MICHAEL KESTAN**, being duly sworn, deposes and says:

    1.    I am the President and owner of Plaintiff Z&J LLC d/b/a AppealTech ("AppealTech"). I submit this Affidavit in Support of AppealTech's application, by Order to Show Cause, for a preliminary injunction and temporary restraining order, pursuant to §§ 6301 and 6313 of the Civil Practice Law and Rules, against Defendants Laurence Mynes ("Mynes") and Counsel Press Inc. ("Counsel Press") (Mynes and Counsel Press collectively referred to herein as the "Defendants") arising from the Employment Agreement between Mynes and AppealTech dated November 16, 2016 (the "Employment Agreement"). I am familiar with the facts and circumstances set forth below.

    2.    As set forth more fully below, Counsel Press embarked on a scheme to eliminate AppealTech as a competitor approximately 18 to 24 months ago. The motivation for this predatory conduct probably arises out of the highly leveraged purchase price paid by Counsel Press's owner, Gladstone Investment Corporation. It is evidenced by the unfair competitive practices that have

occurred since in or about July 2016, if not sooner, with the hiring of multiple, long-term
AppealTech Appellate Consultants, paralegals and production staff as well as the attempted hiring
of sixty-five (65%) of all AppealTech employees. It is further evidenced by the successful efforts
of Counsel Press and those departing employees to misappropriate AppealTech's confidential and
proprietary information, and the statements of Scott Thompson, CEO and President of Counsel
Press, who told Counsel Press employees, in sum or substance, that their goal was to drive
AppealTech out of business. *See* Affidavit of Jacquelyn L. Mouquin dated February 6, 2018
("Mouquin Aff.") at ¶ 5.

**The Parties**

3.       AppealTech is a comprehensive appellate services provider that has been in
operation for approximately twenty (20) years. It maintains offices in New York City, Rochester,
New York and Los Angeles, California, and also services surrounding areas, including New Jersey.

4.       AppealTech is retained during the appellate process to guide attorneys and law
firms through appellate court procedures in various jurisdictions, including New York, New Jersey
and California. AppealTech employees advise clients on the technical and procedural aspects of
appellate practice, including court rules specific to each appellate jurisdiction. AppealTech also
functions as an appellate printer and as an electronic filing service. A list of appellate services
offered by AppealTech is annexed hereto as Exhibit 1.

5.       AppealTech's goodwill and the confidential information it shares with its
employees is necessary to cultivate its client relationships and tantamount to the company's
success.

6.       Indeed, a critical component of the appellate practice service industry is reputation
and the goodwill it generates with its customers. For example, a lawyer who has a positive and

2

FILED: NEW YORK COUNTY CLERK 02/08/2018 01:35 PM

NYSCEF DOC. NO. 50

INDEX NO. 650620/2018

RECEIVED NYSCEF: 02/08/2018

19-01435-jlg    Doc 5-26    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit Y -
Kestan Aff. 1.22.19.    Pg 10 of 29

successful experience with an AppealTech consultant will likely utilize the company's services for all appellate filings in the future. The process of cultivating such relationships requires trust and, ultimately, generates loyalty to the company.

7.      Given its commitment to excellent customer service and support, AppealTech has consistently been voted by the New York Law Journal and the Corporate Counsel as one of the top appellate printers and appellate service providers in the industry. Excerpts from AppealTech's website are annexed hereto as Exhibit 2.

8.      Defendant Counsel Press Inc. ("Counsel Press") is also an appellate service provider and national competitor of AppealTech. It is headquartered in New York City. Like AppealTech, Counsel Press focuses on the preparation of appellate documents, printing services, electronic filing services, and advises law firms and attorneys on procedural court rules by jurisdiction. Excerpts from Counsel Press's website are annexed hereto as Exhibit 3.

9.      Defendant Laurence Mynes ("Mynes") was hired by AppealTech as a Senior Appellate Consultant in January 2006, following a long career in the marketing and advertising industry. A copy of Mynes' publicly available LinkedIn page is annexed hereto as Exhibit 4.

10.     Although most of AppealTech's consultants are licensed attorneys, Mynes is not. Indeed, Mynes arrived at AppealTech as a blank slate, with no legal experience and no experience in the industry.

11.     Accordingly, Mynes learned the appellate services industry solely from his employment with AppealTech.

12.     Prior to joining AppealTech, Mynes did not maintain any client or customer relationships relating to the appellate services industry.

3

FILED: NEW YORK COUNTY CLERK 02/28/2018 01:35 PM
NYSCEF DOC. NO. 80

INDEX NO. 650620/2018
RECEIVED NYSCEF: 02/28/2018

19-01435-jlg    Doc 5-26    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit Y -
Kestan Aff. 1.22.19.    Pg 11 of 29

13.    As a Senior Appellate Consultant, Mynes assisted AppealTech's clients in perfecting thousands of appeals in state and federal appellate courts nationwide.  He specialized in New York State Appellate Divisions, the New York State Court of Appeals, and the Second Circuit Court of Appeals.

14.    AppealTech trained and educated Mynes over the course of twelve (12) years, developing and maintaining goodwill with AppealTech's clients in the process.  Indeed, during Myne's employment with AppealTech he had access to and dealt with most clients of AppealTech's client, including those that were not necessarily his assigned clients.

15.    Through the resources and training provided to him by AppealTech, Mynes' developed significant knowledge and skill in the appellate services industry, working closely with attorneys and managing clerks at law firms to generate sales revenue for the company.  With AppealTech's help, Mynes was successful, increasing his sales significantly from 2011 through 2017 as he developed client relationships and acquired a deeper and more complete understanding and knowledge of appellate procedure.

16.    All of Mynes' present customer relationships were cultivated by AppealTech's contacts, resources and relationships and, as such, are AppealTech's clients, as defined under the express terms of the Employment Agreement.

**Counsel Press Solicits AppealTech Employees in a Calculated Scheme to Undermine AppealTech's Sales and Acquire Confidential Information Through Unlawful Means**

17.    On March 31, 2015, Gladstone Investment Corporation ("Gladstone") announced its acquisition of Counsel Press by investing an aggregate of $32.5 million in a combination of equity and debt into the company.  A copy of Gladstone's press release is annexed hereto as Exhibit 5.

4

FILED: NEW YORK COUNTY CLERK 02/28/2018 01:35 PM
NYSCEF DOC. NO. 50

INDEX NO. 650620/2018

RECEIVED NYSCEF: 02/28/2018

19-01435-jlg    Doc 5-26    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit Y -
Kestan Aff. 1.22.19.    Pg 12 of 29

18.     Upon information and belief, due to the financial stress caused by the high acquisition cost, Counsel Press sought to increase its overall sales and performance.

19.     To reach this goal, in or around the Summer of 2016, Counsel Press initiated a directed and concerted effort to poach AppealTech employees and obtain AppealTech's confidential and proprietary information to undermine its operation and standing in the industry.

20.     Upon information and belief, Counsel Press embarked on this course of conduct with the goal of removing AppealTech as a competitor. *See* Mouquin Aff. at ¶ 5.

21.     In other words, Counsel Press intended to put AppealTech out of business. *Id.*

22.     Thus, on or before August 4, 2016, Jonathan Wallach ("Wallach"), a Senior Appellate Consultant for AppealTech, accepted an offer of employment from Counsel Press. Upon information and belief, that same day, Wallach sent Counsel Press, a file detailing AppealTech's confidential client information. *See* Mouquin Aff. at ¶ 6.

23.     Shortly thereafter, Counsel Press hired two other senior appellate consultants employed by AppealTech.

24.     On August 19, 2016, Wallach resigned from AppealTech and, within an hour, Counsel Press announced his employment.

25.     Similarly, Debra Rudoltz ("Rudoltz") and Tina Fisher ("Fisher"), also Appellate Consultants of AppealTech, resigned from AppealTech in August 2016 and immediately began working for Counsel Press.

26.     Upon information and belief, prior to Fisher's resignation, she contacted Scott Thompson, CEO and President of Counsel Press, to advise him she was gathering AppealTech's confidential information.

5

27.     Upon information and belief, Counsel Press also attempted to poach approximately sixty-five percent (65%) of AppealTech's employees. Counsel Press was successful in hiring seven (7) employees since in or about the August/September 2016 timeframe.

**Mynes November 16, 2016 Employment Agreement**

28.     Given Counsel Press's blatant effort to raid AppealTech of its talent and steal confidential and proprietary information, AppealTech immediately approached Mynes, among other key AppealTech employees, to negotiate the terms of his employment and ensure that AppealTech's confidential and proprietary information was properly safeguarded from its competitor.

29.     In consideration of the proposed restrictive "non-competition" covenant, AppealTech offered Mynes a significant increase in compensation through a draw, which was increased from $80,000 to $120,000 and a commission on net sales. AppealTech offered to increase his commission by directing certain house accounts to him (thereby increasing his overall sales and his percent on commission). Mynes accepted the offer (and his sales almost doubled because of this new structure).

30.     On or about November 16, 2016, Mynes signed the Employment Agreement which contained a restrictive "non-competition" covenant and a confidentiality clause. A copy of Mynes' Employment Agreement is annexed hereto as Exhibit 6.

31.     Paragraph 10 of the Employment Agreement provides, in relevant part, as follows:

> 10.  **Confidential Information.** You agree not to, directly or indirectly, disclose or use any of the Company's Confidential Information (defined below) during or after your employment, except to the extent necessary to perform your job duties .... Notwithstanding the foregoing, you agree to notify any prospective or actual future employer of Sections 10-13 of this Agreement only.

6

32.   Paragraph 12 of the Employment Agreement provides, in relevant part, as

follows:

> 12. **Non-Competition.** You agree that during your employment
> and for a period of six (6) months after your employment terminates
> ("**Restricted Period**") for any reason, you will not, except as
> necessary to perform your job duties for the Company, directly or
> indirectly, on your own behalf or on behalf of any individual or
> entity, as an employee, owner, joint venturer, consultant, contractor,
> volunteer, or otherwise: (a) provide services for any individual,
> entity, or other third party that is engaged or seeks to engage in the
> same or similar business as that of the Company in any geographic
> area in which the Company does or is actively seeking to do
> business; (b) solicit or accept the business of any Client (defined
> below), to the extent such business involves services that are the
> same or similar to those that the Company provides or has provided
> within six (6) months prior to the termination of your employment;
> (c) interfere with the Company's relationship with any Client or
> induce or attempt to induce any Client to change the nature, terms,
> or amount of business it conducts with the Company; or (d) solicit,
> hire, or attempt to solicit or hire, any individual who is an employee,
> consultant, or contractor of the company or who was an employee,
> consultant, or contractor of the Company at any time during the six
> (6) months preceding the termination of this Agreement .... You
> acknowledge and agree that each restriction contained in this
> Section is necessary to protect the Confidential Information,
> goodwill, relationships, and other legitimate business interests of the
> Company and is reasonable in scope, duration, and geography.

33.   Paragraph 15 of the Employment Agreement provides, in relevant part, as

follows:

> 15. **Injunctive Relief.** You acknowledge and agree that if you
> breach, or attempt or threaten to breach, any part of Sections 10-13,
> the Company shall be entitled, in addition to any other right or
> remedy it may have, to an order enjoining or restraining you from
> any breach, or attempted or threatened breach, without having to
> post a bond or other security or prove damages and you hereby
> consent to the issuance of such an order .... If you violate any of the
> provisions of Section 12 ... the duration of the covenants shall be
> extended for the period of time when the violation began until you
> permanently cease such violation. Nothing set forth in this Section
> shall prevent the Company from seeking money damages or other
> relief instead of or in addition to injunctive relief.

7

FILED: NEW YORK COUNTY CLERK 02/28/2018 01:45 PM          INDEX NO. 650620/2018

NYSCEF DOC. NO. 60          19-01435-jlg    Doc 5-26    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit Y -          RECEIVED NYSCEF: 02/28/2018

Kestan Aff. 1.22.19.    Pg 15 of 29

**Mynes' Breach of the Employment Agreement**

34.     Upon information and belief, in or about June 2017, Mynes began to communicate with Counsel Press and provide it with AppealTech's client and business information, in blatant violation of Paragraphs 10 and 12 of the Employment Agreement, in furtherance of a calculated scheme to use this information to his competitive advantage (as well as the competitive advantage of Counsel Press) when he defected to Counsel Press.

35.     Specifically, like Wallach, Mynes began emailing AppealTech's confidential information to his personal email address including, but not limited to, AppealTech's 2017 sales budget, a July 13, 2017 CLE prepared by AppealTech employees, client lists, upcoming filing deadlines for such clients, invoices, outstanding account receivables and other related goodwill. Copies of these emails and screenshots are collectively annexed hereto as Exhibit 7.

36.     Our internal investigation also reveals that Mynes uploaded confidential and client information from his company-issued cell phone to his personal cloud account. Our conclusion is based on the following information.

37.     In order to protect and preserve sensitive documents, confidential information and client relationships, Mynes' company-issued cell phone should have been registered with an AppealTech Apple ID, which would cause the data on his company-issued iPhone to be uploaded to a cloud account owned by AppealTech. Upon Mynes' resignation from the company, AppealTech learned that Mynes had not been using the AppealTech Apple ID. Instead, Mynes had been using his personal Apple ID number instead of the company's ID, meaning that his company-issued cell phone had the capability of syncing AppealTech's data to Mynes' *personal* cloud account.

8

38.    By utilizing his own Apple ID, Mynes has caused AppealTech's confidential and proprietary information to be uploaded to his personal cloud account, and retained it following his resignation, in direct breach of the Employment Agreement. Notably, when Mynes returned the company-issued iPhone at the time of his resignation, all content on the phone had been erased.

39.    The conclusion follows that Mynes began storing AppealTech's confidential and proprietary information for the purpose of using this sensitive data and goodwill when he joined AppealTech's competitor, Counsel Press.

40.    Indeed, we have learned that between September 2017 and December 2017, Mynes engaged in conversations with Counsel Press's head of sales.

41.    On January 17, 2018, Mynes abruptly announced his resignation from AppealTech. He refused to disclose where he would be employed or whether he had found other employment.

42.    Shortly thereafter, on or about January 29, 2018, Counsel Press announced that Mynes had joined the company as a Senior Appellate Consultant in their New York City office, in direct breach of paragraph 12 of the Employment Agreement.

43.    By January 31, 2018, Counsel Press listed Mynes as an employee of Counsel Press on its website, in their New York office, adding his picture to the site on February 1, 2018.

44.    Notably, the title Mynes accepted at Counsel Press, Senior Appellate Consultant, is identical to the title he held at AppealTech. A copy of Mynes' Counsel Press biography page is annexed hereto as Exhibit 8.

45.    On or about January 19, 2018, AppealTech sent Mynes a demand letter to comply with the restrictive "non-competition" covenant and confidentiality provision contained within the Employment Agreement. Mynes never responded. A copy of the letter is annexed hereto as Exhibit 9.

9

46.    On or about January 29, 2018, AppealTech sent Counsel Press a cease and desist letter concerning its deliberate effort to poach AppealTech's employees and breach of the restrictive covenant contained in Mynes' Employment Agreement. A copy of the letter is annexed hereto as Exhibit 10.

47.    On February 2, 2018, Counsel Press, through its counsel, Blank Rome, responded to the January 29, 2018 correspondence advising it will not comply with restrictive covenant, refusing to remove Mynes from its website and maintaining he is "an employee of Counsel Press." A copy of the February 2, 2018 correspondence is annexed hereto as Exhibit 11.

48.    As a result of the foregoing, AppealTech has been severely damaged. Specifically, following the departure of the foregoing key employees, AppealTech's profit has significantly decreased.

49.    Indeed, Counsel Press' ongoing scheme to raid AppealTech of key employees and utilize the Company's confidential information and goodwill is a transparent effort to put AppealTech out of business.

50.    If Mynes' restrictive covenant is not enforced, it is unquestionable that AppealTech will suffer irreparable harm. The trust, confidence and loyalty of its customers and its key employees are quickly eroding.

51.    The necessary six-month restraint of Mynes will provide AppealTech an opportunity to restructure its team and repair its relationships with its customers.

52.    If Mynes' restrictive covenant is not enforced, AppealTech will be in serious risk of injury to its reputation and goodwill.

53.    Given the foregoing, the enforcement of the restrictive "non-compete" covenant in Mynes' Employment Agreement is critical to protect the legitimate interests of AppealTech.

10

FILED: NEW YORK COUNTY CLERK 02/28/2018 01:35 PM          INDEX NO. 650620/2018

NYSCEF DOC. NO. 50     19-01435-jlg   Doc 5-26   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit Y -   RECEIVED NYSCEF: 02/28/2018

Kestan Aff. 1.22.19.   Pg 18 of 29

54.     For all the reasons set forth above and in the accompanying Memorandum of Law,

AppealTech's application should be granted, in its entirety.


Dated: New York, New York
       February ___, 2018


SONJIA R. RICHARDS
Notary Public, State of New York
No. 83-4998375
Qualified in Bronx County
Commission Expires June 29, 2018

_____
MICHAEL KESTAN

Subscribed to before me this 7th day of

F c b r u a r y _____, 2018

_____
NOTARY PUBLIC

# Exhibit B

## EMPLOYMENT AGREEMENT

This **Agreement** is between **Z&J LLC d/b/a AppealTech** (the "Company") and **Jonathan Wallach** ("You").

1. **Employment.** Your initial title will be Staff Counsel. Your employment will be "at will" and may be terminated at any time by you or the Company with or without reason and with or without advance notice.

2. **Draw.** You annualized draw will be $140,000, paid pro rata, less applicable withholdings, in accordance with the Company's regular payroll practices. Any change to your draw shall be deemed an automatic amendment to this Agreement.

3. **Commission.** You will be eligible to earn a **"Commission"** as set forth below after the Company has received $1,167,000 in fees after reduction for **"Expenses"** from **"Your Sales"** in a calendar year. To the extent the Company receives fees, after reduction for Expenses, from Your Sales in a calendar year in an amount:

   - between $1,167,000 and $1,500,000, you will be eligible to earn a Commission of 12% of such fees;

   - between $1,500,001 and $1,800,000, you will be eligible to earn a Commission of 13% of such fees; and

   - that exceeds $1,800,000, you will be eligible to earn a Commission of 14% of such fees.

   *For illustrative purposes only, to the extent the Company receives $1,900,000 in fees after reduction for Expenses from Your Sales in a calendar year, you will be eligible to earn a Commission of $92,960 [(1,500,000-1,167,000)*0.12] + [(1,800,000-1,500,000)*0.13] + [(1,900,000-1,800,000)*0.14].*

   **"Your Sales"** are fee-paying jobs that are: (1) received by the Company due solely to your efforts; and (2) completed and fully paid for by the clients during the term of your employment. **"Expenses"** include mailing, courier, and delivery charges to clients, any discounts or refunds to clients, and any costs the Company incurs to collect payment, such as legal fees, collection agent fees, and other such expenses. If Expenses in any given month exceed the fees the Company received from Your Sales, then the excess of the Expenses over such amount will be carried over to each subsequent month until such time as Your Sales exceed Expenses, or January 1 of the next calendar year, whichever occurs first. A Commission is calculated and **Earned** when the Company receives full payment from the applicable clients (after the first $1,167,000 in a calendar year) during the term of your employment.  Commission will be paid, less applicable withholdings, within one month after the month in which it is Earned, which will be reflected in a monthly reconciliation statement.

4. **Business Expenses.** The Company will reimburse you for reasonable and necessary business expenses that you properly incurred provided you submit appropriate receipts within 30 days of incurring the expense.

5.  **Equipment.** The Company will provide a mobile phone and email device to use for the purpose of performing your duties for the Company. The device will remain the Company's property and your use will be subject to all Company policies.

6.  **Termination.** Following termination of employment, the Company will pay your pro-rated Draw through your last day worked. You are not entitled to payment for any accrued, unused paid time off. You will be paid for any Commissions that you Earned through your last day worked on the terms set forth in Section 3. To the extent Expenses exceed Your Sales as of the date your employment terminates, you will not be required to reimburse the Company for such deficit.

7. **Section 409A.** Payments made pursuant to this Agreement are intended to be exempt from or to strictly comply with the provisions of Section 409A of the Internal Revenue Code.

8.  **Return of Property.** You agree to return all Confidential Information (defined in Section 10), including all copies, and all other Company property upon termination or at the Company's request at any time.

9.  **No Restrictions.** You represent and warrant that you are not subject to any obligations that in any way restrict your ability to accept employment with and fully perform your duties for the Company. You agree not to bring or use anything that contains another's confidential information.

10.  **Confidential Information.** You agree not to, directly or indirectly, disclose or use any **"Confidential Information"** during or after your employment, except as required to do your job for the Company and as may be required by law or subpoena, in which event you agree to provide the Company with the opportunity to seek a protective order or other relief prior to making any disclosure. **"Confidential Information"** means any and all proprietary, confidential or sensitive information; data, trade secrets or know-how of the Company, including, but not limited to: client and potential client names; contact details for, personal data concerning, and needs, preferences, and specifications of clients and potential clients; product/services lists; relationships and arrangements with vendors; marketing strategies and plans; operating strategies and plans; finances; financing strategies and plans; pricing; commissions; relationships, methodologies; processes; research; business plans; alliances; software; databases; source code; developments; Inventions; technology; designs; and any other technical, financial, or business information or plans pertaining to the Company's business. Confidential Information does not include information that is or has become publicly known and made generally available through no wrongful act of you or others who had confidentiality obligations to the Company. Notwithstanding the foregoing, you . agree to notify any prospective or actual future employer of Sections 10-13 of this Agreement only.

11.  **Intellectual Property.** You will not, directly or indirectly, on your own or by, through or for any other person or entity, claim ownership of any product development efforts undertaken while employed by the Company. You acknowledge and agree that all concepts, design, work product, improvements, modifications, and finished product are the sole and exclusive property of the Company.  You will hold in trust for the sole right and benefit of the Company, and hereby irrevocably and perpetually assign to the Company, or its designee, all of your right, title, and interest, if any, in any and all **"Inventions."** You acknowledge and agree that the decision whether or not to commercialize any Invention is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other payment will be due to you as a result of the Company's efforts to commercialize any Invention. You further acknowledge that all original works

Page 2 of 4

FILED: NEW YORK COUNTY CLERK 01/22/2019 07:45 PM
INDEX NO. 650620/2018
NYSCEF DOC. NO. 178
19-01435-jlg   Doc 5-26   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit Y -
Kestan Aff. 1.22.19.   Pg 22 of 29
RECEIVED NYSCEF: 01/22/2019

of authorship which are made by you, solely or jointly with others, related to services provided during the course of your employment with the Company that are protectable by copyright are "works made for hire," as that term is defined in the U.S. Copyright Act. You agree not to seek injunctive relief against the Company related to its use of any material on which you have worked. "Inventions" means any and all inventions, products, processes, original works of authorship, developments, concepts, improvements, modifications, designs, discoveries, techniques, methods, technologies, data, media, derivative works, ideas, trademarks, or trade secrets, whether or not patentable or registrable under copyright or other laws, rules or regulations, of the Company, including without limitation those that you may, solely or jointly, conceive, develop, or reduce to practice, or cause to be conceived, developed, or reduced to practice, during or in the scope of your employment.

12. **Non-Solicitation.** You acknowledge and agree that each restriction contained in this Section is necessary to protect the Confidential Information, goodwill, relationships, and other legitimate business interests of the Company and is reasonable in scope, duration, and geography. You agree that, during your employment and for twelve (12) months after your employment terminates, voluntarily or involuntarily, you will not, directly or indirectly, on your own behalf or on behalf of any individual or entity, in any geographic area in which the Company does or is seeking to do business, engage in any of the following conduct, except as necessary to perform your job duties for the Company:

(a) encourage, induce or attempt to encourage or induce any Client to change the nature, terms, or amount of business it conducts with the Company; or

(b) solicit, hire, or attempt to solicit or hire, any individual who is an employee, consultant, or contractor of the Company or who was an employee, consultant, or contractor of the Company at any time during the six (6) months preceding the termination of this Agreement.

For purposes of this Section 12, all references to a **Client**: (i) include any individual, entity, or other third party that is, or was during your employment or the six (6) months prior to the termination of your employment, a customer of the Company or a potential customer from whom the Company actively sought business; and (ii) exclude any individual, entity, or other third party with whom you had a business relationship and for whom you provided appellate services prior to your employment with the Company.

13. **Non-disparagement.** During and after your employment, you agree not to make any statements (verbally, in writing, or electronically) that are disparaging, untrue, or that could reasonably be expected to impair the business, goodwill, or reputation of the Company or its owners, officers, or employees.

14. **Law and Attorneys' Fees.** This Agreement will be governed by New York law without regard to choice of law principles. You hereby consent to the exclusive jurisdiction of the state or federal courts located in New York County with respect to any dispute arising hereunder. The prevailing party in any dispute arising out of this Agreement shall be reimbursed by the other party for all reasonable attorneys' fees and costs.

15. **Injunctive Relief.** You acknowledge and agree that if you breach, or attempt or threaten to breach, any part of Sections 10-13, the Company shall be entitled, in addition to any other right or

remedy it may have, to an order enjoining or restraining you from any breach, or attempted or threatened breach, without having to post a bond or other security or prove damages and you hereby consent to the issuance of such an order. If you violate any of the provisions of Section 12, then in addition to all other remedies available to Company, the duration of the covenants shall be extended for the period of time when the violation began until you permanently cease such violation. Nothing set forth in this Section shall prevent the Company from seeking money damages or other relief instead of or in addition to injunctive relief.

**16. Miscellaneous.** The parties waive any rule of construction that would require an interpretation against the drafter. Headings are for reference purposes only. If either party waives or fails to dispute any breach of this Agreement, such party will not be deemed to have waived any other breach of this Agreement. If any provision of this Agreement is deemed illegal or unenforceable, that provision will be limited to the extent required to be enforced, and, if necessary, severed, and all other provisions will remain effective. The obligations herein, which, by their terms, extend beyond termination of this Agreement and/or your employment, and all related provisions necessary to enforce such obligations, shall survive such termination. This Agreement states the entire agreement and supersedes all prior agreements, statements, and negotiations with respect to the subject matter hereof. This Agreement may only be modified in a writing signed by both parties.

**17. Acknowledgements.** You acknowledge and agree that: (a) you carefully read and understand all the terms and conditions of this Agreement, including the restrictions imposed on you in Sections 10-13; (b) you had ample opportunity to consult legal counsel regarding this Agreement; (c) the benefits you are receiving hereunder are sufficient consideration for the promises you are making hereunder; and (d) you are freely and voluntarily entering into this Agreement.

**ACCEPTED AND AGREED:**

Jonathan Wallach

Date: 3/5/2014

Z&J LLC d/b/a AppealTech

Date: 3/5/2014

# Exhibit C



### APPEALTECH
YOUR APPELLATE PARTNER

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("**Agreement**") is between **Z&J LLC d/b/a AppealTech** (the "**Company**") and **Laurence Mynes** ("**you**").

**1. Employment.** You will be employed as Senior Appellate Consultant. Your employment will be **at will** and may be terminated at any time by you or the Company, with or without reason, and with or without advance notice.

**2. Draw.** Your annualized draw will be $120,000 ("**Draw**"), paid pro rata, less applicable withholdings, in accordance with the Company's regular payroll practices. Any change to your Draw shall be deemed an automatic amendment to this Agreement.

**3. Commissions.** You will be eligible to earn a "**Commission**" at the rate set forth below on Your Net Sales. "**Your Net Sales**" are the fees less the Expenses (defined below) that the Company receives from jobs due solely to your efforts, which have been completed and fully paid for by the client(s), on a calendar year basis, during the term of your employment.

In the event Your Net Sales in a calendar year are between the following amounts, the corresponding Commission rate shall apply:

| Your Net Sales | Commission rate |
|---|---|
| $1 and $700,000 | 10% |
| $700,001 and $1,100,000 | 12% |
| $1,100,001 and $1,300,000 | 13% |
| $1,300,001 and up | 14% |

For illustrative purposes only, to the extent Your Net Sales in a calendar year are $1,400,000, you will be eligible to earn a Commission of $157,999.60 [(700,000*0.10) + (399,999*0.12) + (199,999*0.13) + (99,999*0.14)].

"Expenses" are costs that the Company incurs related to the sales that are included in Your Net Sales, including your pro-rated Draw, mailing, courier, and delivery charges to clients, and any discounts or refunds to clients. If Expenses in a given month exceed Your Net Sales, then the excess of the Expenses will be carried over and included in Expenses when calculating subsequent Commissions until such time as Your Net Sales exceed Expenses. To the extent Expenses exceed Your Net Sales when your employment terminates, you will not be required to reimburse the Company for such deficit.

A Commission is calculated and Earned when the Company receives full payment from the applicable clients during the term of your employment. A Commission will be paid, less applicable withholdings,

7 West 36th Street ● 12th Floor ● New York, New York 10018 ● Tel. 212-213-3222 ● Fax 212-213-9702
8 Exchange Blvd. ● Suite 170 ● Rochester, New York 14614 ● Tel. 585-802-9837 ● Fax 585-295-9652
www.appealtech.com

within one month after the month in which it is Earned. You will receive a monthly reconciliation statement reflecting any Commission that you Earned.

4. **Benefits.** You will be eligible to take 15 vacation and 5 sick days per year, pro-rated for partial years, in accordance with the Company's policies. Accrued, unused vacation and sick days do not carry over from year to year (except to the extent provided otherwise by applicable law) and are forfeited upon termination of employment. You also will be eligible for fringe benefits that are made available to employees of the Company generally in accordance with the terms of the applicable plans or policies.

5. **Expenses.** You will be reimbursed for reasonable and necessary business expenses, provided you submit appropriate documentation and receipts within 30 days of incurring the expense.

6. **Equipment.** The Company will provide a mobile device for you to use to perform your job duties. The device will remain the Company's property and your use will be subject to all Company policies. You may choose to use your own device and have the company reimburse your mobile phone charges each month.

7. **Termination.** In the event your employment terminates for any reason, the Company will pay your pro-rated Draw through your last day worked. You will be paid any Commissions that you Earned through your last day worked on the terms set forth in Section 3.

8. **Return of Property.** You agree to return all Company property, including without limitation mobile devices, keys, access cards, passwords, and all Confidential Information (defined in Section 10) and copies thereof, upon termination of employment or at the Company's request at any time.

9. **No Restrictions.** You acknowledge and agree that in offering employment to you, the Company has reasonably relied upon your representations that: (a) you do not have any legal restrictions that would prohibit you from working for the Company or fully performing the duties of a Staff Counsel for the Company; and (b) you will not bring or disclose to the Company, or use in your employment with the Company, any confidential or proprietary information that is the property of any other person or entity, including any such information that you may be restricted from disclosing or using under any agreement with any current or prior employer.

10. **Confidential Information.** You agree not to, directly or indirectly, disclose or use any of the Company's Confidential Information (defined below) during or after your employment, except to the extent necessary to perform your job duties for the Company. **Confidential Information** means any and all proprietary, confidential, or sensitive information, and any and all data, trade secrets, or know-how of the Company, including, but not limited to: client and potential client identities and lists; contact details for, personal data concerning, and needs, preferences, and specifications of clients and potential clients; product/services lists; relationships and arrangements with vendors; marketing strategies and plans; operating strategies and plans; finances; financing strategies and plans; pricing; commissions; relationships, methodologies; processes; research; business plans; alliances; technology; software; databases; source code; planned technology or software improvements or changes; developments; Inventions (defined in Section 11); designs; and any other technical, financial, or business information or plans pertaining to the Company's business. Confidential Information does not include information that is or has become publicly known or made generally available through no wrongful act of you or anyone else who had confidentiality obligations

FILED: NEW YORK COUNTY CLERK 02/28/2018 01:45 PM
INDEX NO. 650620/2018

NYSCEF DOC. NO. 12      19-01435-jlg   Doc 5-26   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit Y -
RECEIVED NYSCEF: 02/28/2018

Kestan Aff. 1.22.19.   Pg 27 of 29

to the Company. Notwithstanding the foregoing, you agree to notify any prospective or actual future employer of Sections 10-13 of this Agreement only. You acknowledge and agree that nothing in this Agreement shall preclude you or the Company from providing truthful information: (a) in response to lawful inquiries from governmental, regulatory, or self-regulatory agencies; (b) in response to a valid subpoena, court order or other legal process; (c) in connection with lawful governmental, regulatory, or self-regulatory agency investigations; or (d) to any governmental, regulatory, or self-regulatory agency, including the Securities and Exchange Commission, about a possible violation of law. You further agree to provide the Company with the opportunity to seek a protective order or other relief prior to making any disclosure required by subpoena, court order, legal process, or a governmental, regulatory, or self-regulatory agency investigation.

11. **Intellectual Property.** You will not, directly or indirectly, on your own or by, through or for any other person or entity, claim ownership of any product, technology, automation, computer, or software development efforts undertaken while employed by the Company. You acknowledge and agree that all concepts, designs, work product, improvements, modifications, and finished product are the sole and exclusive property of the Company. You will hold in trust for the sole right and benefit of the Company, and hereby irrevocably and perpetually assign to the Company, or its designee, all of your right, title, and interest, if any, in any and all Inventions (defined below). You acknowledge and agree that the decision whether or not to commercialize any Invention is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other payment will be due to you as a result of the Company's efforts to commercialize any Invention. You further acknowledge that all original works of authorship that are made by you, solely or jointly with others, related in any way to services provided during the course of your employment with the Company that are protectable by copyright are "works made for hire," as that term is defined in the U.S. Copyright Act. You agree not to seek injunctive relief against the Company related to its use of any material on which you have worked. **Inventions** means any and all inventions, products, processes, original works of authorship, developments, concepts, improvements, modifications, designs, discoveries, techniques, methods, technologies, software, automation, data, databases, media, derivative works, ideas, trademarks, or trade secrets, whether or not patentable or registrable under copyright or other laws, rules or regulations, of the Company, including without limitation those that you may, solely or jointly, conceive, develop, or reduce to practice, or cause to be conceived, developed, or reduced to practice, during or in the scope of your employment.

12. **Non-Competition.** You agree that during your employment and for a period of six (6) months after your employment terminates ("**Restricted Period**") for any reason, you will not, except as necessary to perform your job duties for the Company, directly or indirectly, on your own behalf or on behalf of any individual or entity, as an employee, owner, joint venturer, consultant, contractor, volunteer, or otherwise: (a) provide services for any individual, entity, or other third party that is engaged or seeks to engage in the same or similar business as that of the Company in any geographic area in which the Company does or is actively seeking to do business; (b) solicit or accept the business of any Client (defined below), to the extent such business involves services that are the same or similar to those that the Company provides or has provided within the six (6) months prior to the termination of your employment; (c) interfere with the Company's relationship with any Client or induce or attempt to induce any Client to change the nature, terms, or amount of business it conducts with the Company; or (d) solicit, hire, or attempt to solicit or hire, any individual who is an employee, consultant, or contractor of the Company or who was an employee, consultant, or contractor of the Company at any time during the six (6) months preceding the termination of this

Page 3 of 5

7 West 36th Street ● 12th Floor ● New York, New York 10018 ● Tel. 212-213-3222 ● Fax 212-213-9702
8 Exchange Blvd. ● Suite 170 ● Rochester, New York 14614 ● Tel. 585-802-9837 ● Fax 585-295-9652
www.appealtech.com

Agreement. "**Client**" means any individual or entity that is, or during the last six (6) months of your employment was, a customer of the Company or a potential customer from whom the Company actively sought business. Notwithstanding the foregoing: (i) you may be a passive owner of up to 5% of the outstanding stock of any publicly traded corporation that competes with the Company; and (ii) the terms of Section 12(a) shall not apply if the Company terminates your employment without Cause (defined below). You acknowledge and agree that each restriction contained in this Section is necessary to protect the Confidential Information, goodwill, relationships, and other legitimate business interests of the Company and is reasonable in scope, duration, and geography. "**Cause**" means your: (i) material breach of this Agreement or any other agreement with, or policy of, the Company; (ii) failure or refusal to perform your job duties or follow a lawful directive; (iii) unsatisfactory performance; (iv) fraud, disloyalty, negligence, misconduct, or dishonesty with respect to the Company, a client of the Company, or your job duties; (v) illegal conduct involving dishonesty, fraud or theft; (vi) any act that could reasonably be expected to harm the reputation of the Company or any of its owners; (vii) misappropriation or diversion of any of the Company's assets or business opportunities; (viii) failure to disclose to the Company information material to its business; or (ix) excessive absences or tardiness.

13.  **Non-disparagement.** During and after your employment, you agree not to make any statements (verbally, in writing, or electronically) that are disparaging, untrue, or that could reasonably be expected to impair the business, goodwill, or reputation of the Company or its owners, officers, or employees.

14.  **Law.**  This Agreement shall be governed by New York law without regard to choice of law principles. You hereby consent to the exclusive jurisdiction of the state or federal courts located in New York County with respect to any dispute arising hereunder. The prevailing party in any dispute arising out of this Agreement shall be reimbursed by the other party for all reasonable attorneys' fees and costs.

15.  **Injunctive Relief.**  You acknowledge and agree that if you breach, or attempt or threaten to breach, any part of Sections 10-13, the Company shall be entitled, in addition to any other right or remedy it may have, to an order enjoining or restraining you from any breach, or attempted or threatened breach, without having to post a bond or other security or prove damages and you hereby consent to the issuance of such an order. If you violate any of the provisions of Section 12, then in addition to all other remedies available to Company, the duration of the covenants shall be extended for the period of time when the violation began until you permanently cease such violation. Nothing set forth in this Section shall prevent the Company from seeking money damages or other relief instead of or in addition to injunctive relief.

16.  **Miscellaneous.**  The parties waive any rule of construction that would require an interpretation against the drafter. Headings are for convenience only. If either party waives or fails to dispute a breach of this Agreement, such party will not be deemed to have waived any other breach of this Agreement. If any provision of this Agreement is deemed illegal or unenforceable, that provision shall be limited to the extent required to be enforced, and, if necessary, severed, and all other provisions will remain effective. The obligations herein, which, by their terms, extend beyond termination of this Agreement and/or your employment, and all provisions necessary to enforce such obligations, shall survive such termination. This Agreement states the entire agreement and

Page 4 of 5

7 WEST 36TH STREET ● 12TH FLOOR ● NEW YORK, NEW YORK 10018 ● TEL. 212-213-3222 ● FAX 212-213-9702
8 EXCHANGE BLVD. ● SUITE 170 ● ROCHESTER, NEW YORK 14614 ● TEL. 585-802-9837 ● FAX 585-295-9652
www.appealtech.com

supersedes all prior agreements, statements, and negotiations with respect to the subject matter hereof. This Agreement may only be modified in a writing signed by both parties.

17. **Acknowledgements.** You acknowledge and agree that: (a) you understand all of the terms and conditions of this Agreement, including the restrictions in Section 12; (b) you had sufficient opportunity to consult legal counsel regarding this Agreement; (c) the benefits you are receiving are sufficient consideration for the promises you are making in this Agreement; and (d) you are freely and voluntarily entering into this Agreement and agreeing to be bound by all of its terms.

ACCEPTED AND AGREED:

Laurence Mynes                          Z&J LLC d/b/a AppealTech

By: _____

Date: _11 / 16 / 16____          Date: _9/13/16_____