# Exhibit KK

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 2 of 32

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Z & J LLC d/b/a APPEALTECH, | NYSCEF CASE |
| Plaintiff, | Hon. Doris Ling-Cohan, J.S.C |
| v. | No. 650620/2018 |
| LAURENCE MYNES, COUNSEL PRESS INC., GLADSTONE INVESTMENT CORPORATION, GLADSTONE MANAGEMENT CORPORATIONS, GLADSTONE ADMINISTATION, LLC AND JONATHAN WALLACH, | Motion Seq. No. 5 |
| Defendants. | |
| LAURENCE MYNES AND JONATHAN WALLACH, | |
| Counterclaim Plaintiffs, | |
| v. | |
| Z & J LLC d/b/a APPEALTECH AND MICHAEL KESTAN, Jointly and Severally, | |
| Counterclaim Defendants. | |

## AFFIRMATION OF DOUGLAS B. LIPSKY IN SUPPORT OF DEFENDANTS LAURENCE MYNES AND JONATHAN WALLACH'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Douglas B. Lipsky, Esq., an attorney duly licensed to practice before the Courts

of the State of New York, affirms the truth of the following under the penalties of

perjury.

1.      I submit this Affirmation in support of Defendants Laurence Mynes and

Jonathan Wallach's Motion to Dismiss Plaintiff's First Amended Complaint, as against

them, as a matter of law under C.P.L.R. § 3211.

2.      Attached are copies of the unpublished decisions in Defendants' February

22, 2019 Memorandum of Law:

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 3 of 32

| Exhibit | Case |
|---------|------|
| A | *Admarketplace Inc. v. Salzamn,* Index No. 651390/2013, 2014 N.Y. Misc. Lexis 1458 (N.Y. Sup. N.Y. Cty. March 28, 2014) |
| B | *Healthworld Corp. v. Gottlieb*, Index No. 600641/04, 2004 N.Y. Misc. Lexis 3281 (N.Y. Sup. Crt. N.Y. Cty. April 21, 2004) |
| C | *Lionella Prods., Ltd. v. Mironchik,* Index No. 108693/98, 2012 N.Y. Misc. Lexis 3472 (N.Y. Sup. Crt. N.Y. Cty. July 13, 2012) |
| D | *Noise Marketing LLC v. Great Works America, Inc.*, Index No. 113722/08, 2009 N.Y. Misc. Lexis 4709 (N.Y. Sup. Ct. N.Y. Cty April 29, 2019) |

Dated: New York, New York
February 22, 2019

LIPSKY LOWE LLP


s/ Douglas B. Lipsky
Douglas B. Lipsky
630 Third Avenue, Fifth Floor
New York, New York 10017
Tel. 212.392.4772
Fax. 212.444.1030
doug@lipskylowe.com
*Counsel for Defendant Mynes*

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM INDEX NO. 650620/2018

NYSCEF DOC. NO. 94     19-01435-jlg     Doc 5-38     Filed 12/23/19     Entered 12/23/19 16:01:58     Exhibit KK -     RECEIVED NYSCEF: 02/22/2019

Aff. in Reply     Pg 4 of 32

# EXHIBIT A

 Positive
As of: February 22, 2019 6:05 PM Z

## *Admarketplace Inc. v Salzman*

Supreme Court of New York, New York County

March 28, 2014, Decided

651390/2013

**Reporter**

2014 N.Y. Misc. LEXIS 1458 *; 2014 NY Slip Op 30813(U) **

[**1]  ADMARKETPLACE INC., Plaintiff, -against- MICHAEL SALZMAN, VERTICAL SEARCH WORKS, INC., & KEVIN CARNEY, Defendants. Index No.: 651390/2013

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

## Core Terms

employees, *confidential*, *confidential information*, soliciting, breach of contract, allegations, competitor, customers, database, breach of fiduciary duty, tortious interference, trade secret, misappropriation, enforceable, services

**Judges:**  [*1] SHIRLEY WERNER KORNREICH, J.S.C.

**Opinion by:** SHIRLEY WERNER KORNREICH

## Opinion

**DECISION & ORDER**

SHIRLEY WERNER KORNREICH, J.:

Defendants Michael Salzman, Vertical Search Works, Inc. (VSW), and Kevin Carney move to dismiss the Second Amended Complaint (the SAC) pursuant to *CPLR 3211*. Defendants' motion is granted in part and denied in part for the reasons that follow.

*I. Procedural History*

On April 16, 2013, plaintiff adMarketplace Inc. (AMP) commenced this action to enjoin Salzman, a former employee, from working for VSW, a competitor. Salzman was accused

of violating a contractual non-competition agreement, as well as misappropriating trade secrets and other ***confidential information*** that he allegedly was using to help VSW poach employees and clients from AMP. AMP moved for preliminary injunctive relief, which was denied. *See* Dkt. 18. AMP filed an amended complaint on April 29, Salzman and VSW answered on May 20, and a discovery schedule was set in a preliminary conference order dated May 21, 2013. On June 14, 2013, AMP moved, for a second time, for preliminary injunctive relief against Salzman and VSW and, for the first time, against Carney, a newly added defendant who also left AMP to work for VSW. The court  [*2] denied the motion. *See* Dkt. 44.

[**2]  AMP filed the SAC on August 15, 2013. It contains eight causes of action: (1) breach of contract against Salzman and Carney for disclosing ***confidential information***; (2) misappropriation of ***confidential information*** and trade secrets against Salzman and Carney; (3) breach of contract against Salzman for soliciting AMP's employees; (4) breach of contract against Salzman and Carney for soliciting AMP's clients; (5) breach of fiduciary duty against Salzman and Carney; (6) aiding and abetting breach of fiduciary duty against VSW; (7) tortious interference with contract against VSW; and (8) unfair competition against all defendants.

*II. Factual Background*

As this is a motion to dismiss, the facts recited are taken from the SAC.

AMP and VSW are search advertising agencies that sell online pay-per-click services. SAC ¶¶ 1, 6. On June 19, 2012, AMP hired Salzman to be its director of sales. ¶ 7. On August 28, 2012, AMP hired Carney to be an account director. ¶ 8. At the commencement of their employment, Salzman and Carney signed written non-disclosure agreements (the NDA), which prohibit them from disclosing "***Confidential Information***" to competitors. ¶ 9. ***Confidential***  [*3] ***information*** is defined to include "trade secrets and other ***confidential*** and/or proprietary ***information*** of [AMP] provided to [employees] in

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM    INDEX NO. 650620/2018
NYSCEF DOC. NO. 54    RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 6 of 32    Page 2 of 4

2014 N.Y. Misc. LEXIS 1458, *3; 2014 NY Slip Op 30813(U), **2

connection with [their] at-will employment [with AMP] ... including ... marketing research ... pricing information ... [lists of] clients or customers of [AMP], including ... past, existing or potential clients and customers." *Id*. Additionally, the NDA prohibits Salzman and Carney from soliciting former AMP employees, customers, or prospective customers after the termination of their employment, ¶¶ 10-11. Salzman's ban on non-solicitation lasts for six months and Carney's for one year. *Id*.

 [**3] Upon Salzman's termination, discussed below, he also signed a Separation Agreement in which he reaffirmed his confidentiality obligations under the NDA. ¶ 14. AMP claimed they insisted on these confidentiality clauses because, while employed at AMP, Salzman and Carney had access to all of AMP's client information, which was stored in a proprietary, password protected database only accessible by current employees. ¶ 15.

Salzman resigned from AMP on February 25, 2013. ¶ 24, Two days later, on February 27, AMP met with VSW to explore the possibility of working together.  [**4] ¶ 19. At that meeting, AMP alleged that they realized that VSW was a direct competitor and, therefore, decided against working with it. ¶ 20. Shortly after that meeting, in early March 2013, Salzman began working as a senior vice president of sales at VSW. ¶ 24. After Salzman joined VSW, the complaint alleges he began to solicit AMP's employees. ¶ 27. On March 11, 2013, Salzman sent a text message to Mike Myslinski, a former VSW employee who left to work for AMP, telling him to "come back" to VSW. ¶ 28. On April 2, 2013, Salzman emailed Carney, attaching a VSW employment application, and requested an updated resume "so I can get you the offer in writing." ¶ 29. Salzman is alleged to have caused at least three other employees to leave AMP for VSW. ¶¶ 31-33. Salzman also is alleged to have stolen confidential client data from AMP. The complaint states that Salzman took 55 pages of confidential documents when he resigned. ¶ 42. He also illegally attempted to log into AMP's database after he resigned — from a VSW computer with his old login information. ¶¶ 44-45. AMP traced this attempted login as having occurred on March 12, 2013, at 8:57 am, from the IP address of a VSW computer.[1] *Id*.

 [**4] On April 16, 2013, the day this action was commenced, AMP informed all of its employees, including Carney, that VSW was a competitor and directed all employees to sign a revised schedule to the NDA, specifically applying their confidentiality restrictions to VSW. ¶ 23.

Carney refused to sign the revised schedule. ¶ 26. On April 18, 2013, at 2:11 pm, AMP's vice present of finance sent Carney an instant message instructing him to sign the revised schedule. ¶ 52. Twenty-five minutes later, at 2:36 pm, Carney created a new excel spreadsheet into which he copied confidential customer data from the AMP database. ¶ 53. Less than an hour later, at 3:26 pm, Carney email another excel file, including eleven worksheets containing virtually all of Carney's client solicitation records while working for AMP, from his AMP email address to his personal email address. ¶ 54. On April 22, 2013, Carney resigned from AMP. *Id*. Two days later, on April 24, at 2:25 pm, Carney made four attempts to access AMP's database using his old login credentials from the very same VSW computer that Salzman used on March 12. In May 2013, Salzman  [*6] and Carney began soliciting AMP's clients to move their business to VSW. ¶¶ 47, 59.

In this action, AMP seeks an order: (1) compelling VSW to terminate AMP's former employees; (2) enjoining defendants from using AMP's ***confidential*** ***information***; (3) enjoining defendants from soliciting AMP's clients and employees; and (4) compensating it for the business AMP lost due to defendants' unfair competition.

## III. Discussion

On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. *Amaro v. Gani Realty Corp.*, *60 AD3d 491, 876 N.Y.S.2d 1 (1st Dept 2009)*; *Skillgames, LLC v Brody, 1 AD3d 247, 250, 767 N.Y.S.2d 418 (1st Dept 2003)*, [**5]  citing *McGill v Parker, 179 AD2d 98.105, 582 N.Y.S.2d 91 (1992)*; *see also Cron v Harago Fabrics, 91 NY2d 362, 366, 694 N.E.2d 56, 670 N.Y.S.2d 973 (1998)*. The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. *Skillgames, id*., citing *Guggenheimer v Ginzburg, 43 NY2d 268, 275, 372 N.E.2d 17, 401 N.Y.S.2d 182 (1977)*. Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff.  [**7] *Amaro, 60 NY3d at 491*. "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." *Skillgames, 1 AD3d at 250*, citing *Caniglia v Chicago Tribune-New York News Syndicate, 204 AD2d 233, 612 N.Y.S.2d 146 (1st Dept 1994)*. Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if "the documentary evidence utterly refutes

---

[1] AMP  [*5] has not asserted a claim under the Computer Fraud and Abuse Act, *18 USC § 1030*.

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM          INDEX NO. 650620/2018
NYSCEF DOC. NO. 94          RECEIVED NYSCEF: 02/22/2019

19-01435-jlg   Doc 5-38   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit KK -
Aff. in Reply   Pg 7 of 32          Page 3 of 4

2014 N.Y. Misc. LEXIS 1458, *7; 2014 NY Slip Op 30813(U), **5

plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v Mutual Life Ins. Co. of N. Y.,* 98 NY2d 314, 326, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002)* (citation omitted); *Leon v Martinez,* 84 NY2d 83, 88, 638 N.E.2d 511, 614 N.Y.S.2d 972 (1994).

Since AMP seeks to enforce restrictive covenants, the court must first consider the threshold issue of their enforceability.

It is well settled that "[i]n order to be enforceable, an anticompetitive covenant ancillary to an employment agreement must be reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the public, and not unreasonably burdensome to the employee." *Crown It Services, Inc. v Koval-Olsen,* 11 AD3d 263, 264, 782 N.Y.S.2d 708 (1st Dept 2004), **[*8]** citing *BDO Seidman v Hirshberg,* 93 NY2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999). The Court of Appeals "has limited the cognizable employer interests under the [reasonableness prong] to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection **[**6]** from competition by a former employee whose services are unique or extraordinary." *BDO Seidman, 93 NY2d at 389.* A restriction on a former employee's ability to work for a competitor is invalid unless the employee's services were "unique or extraordinary" or if the job is considered a "learned profession" (such as law or accounting). *Id. at 389-90.*

First, it is clear that the NDA's prohibition of Salzman and Carney working for a competitor is unenforceable. They work in the pay-per-click online marketing industry, which is not a learned profession, and their services are not unique. The law is well settled that agreements barring such employees from working for competitors are unenforceable.

That being said, disclosing **_confidential information_** and trade secrets in violation of the NDA and the common law is very much an enforceable breach. The SAC states claims for such breaches since it clearly identifies numerous **[*9]** contractually defined **_confidential_** items, such as client **_information_** stored on a password protected database. The questions of fact raised as to the confidentiality of alleged misappropriated item are not properly addressed on a motion to dismiss. For instance, the uncertainty over whether the client list on AMP's website is exhaustive is a matter for discovery. Defendants' documentary evidence does not utterly refute the allegation that only some of AMP's client are listed on the website (for marketing purposes), not all of its clients. In any event, confidentially extends well beyond the identity of the clients to substantial data about such clients that AMP uses to procure continued business.

As for the prohibition on soliciting former employees, this court recently observed that there is scant case law on the enforceability of non-recruitment clauses. *See OTG Mgmt., LLC v Konstantinidis,* 40 Misc3d 617, 621, 967 N.Y.S.2d 823 (Sup Ct, NY County 2013), citing *Renaissance Nutrition, Inc. v Jarrett,* 2012 U.S. Dist. LEXIS 2490, 2012 WL 42171, at *2 (WDNY 2012)* and *Lazer Inc. v. Kesselring,* 13 Misc. 3d 427, 823 N.Y.S.2d 834 (Sup Ct, Monroe County 2005). This court, persuaded by the analysis in *Renaissance Nutrition* **[**7]** and *Lazer,* upheld a two year non-recruitment **[*10]** clause because such a restriction is "'inherently more reasonable and less restrictive' than non-compete clauses" since it does not impact the employee's ability to procure employment. *Id.,* quoting *Renaissance Nutrition, 2012 U.S. Dist. LEXIS 2490, 2012 WL 42171, at *5.* Here, the duration of the NDA's non-recruitment clauses is shorter than in *OTG.* Additionally, AMP "has a legitimate interest in the protection of client relationships developed at the employer's expense." *See Renaissance Nutrition, 2012 U.S. Dist. LEXIS 2490, 2012 WL 42171, at *3,* citing *BDO Seidman, 93 NY2d at 392; Marsh USA Inc. v Karasaki,* 2008 U.S. Dist. LEXIS 90986, 2008 WL 4778239, at *16 (SDNY 2008).* The gravamen of AMP's allegations is that VSW has been poaching employees from AMP, inducing them to switch companies for greater compensation hoping that bring proprietary information with them. A non-recruitment prohibition directly guts this channel of wrongful competition. This is reasonable and, therefore, enforceable. The extent to which such allegations have merit, of course, is a matter for discovery.

Indeed, the existence of actual monetary damages here is questionable. Though AMP has been in court to argue three motions in this case, it has yet to identify any actual lost business. Though **[*11]** such proof is not required at this juncture, absent lost business, there is little relief to be had by AMP. As explained to the parties on multiple occasions, no one's employment will be terminated as a result of this case. For AMP to recover from defendants, it must prove a nexus between the alleged violations of the subject restrictive covenants and revenue generated by defendants using **_confidential_** **_information_**.

The same is true for the tortious interference claim against VSW. "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting **[**8]** therefrom." *Lama Holding Co. v Smith Barney Inc.,* 88 NY2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996).* AMP can prevail on this claim if it can demonstrate VSW's inducement of NDA breaches. But AMP can only recover against VSW if it can show "damages resulting" from such breaches (i.e. lost business). Likewise,

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM    INDEX NO. 650620/2018

NYSCEF DOC. NO. 94    19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -    RECEIVED NYSCEF: 02/22/2019
Aff. in Reply    Pg 8 of 32    Page 4 of 4

2014 N.Y. Misc. LEXIS 1458, *11; 2014 NY Slip Op 30813(U), **8

AMP may recover against defendants for unfair competition since stealing **_confidential_** client **_information_** to compete **[\*12]** is illegal. *See Mitzvah Inc. v Power, 106 AD3d 485, 487, 966 N.Y.S.2d 3 (1st Dept 2013)*. Though defendants raised myriad questions of fact about the confidentiality of such client information, their attempts to hack into AMP's client database is more than sufficient on this motion to infer that such information is secret.

Finally, the claim for breach of fiduciary duty against Salzman and Carney is duplicative. It is well settled that an employee must "exercise the utmost good faith and loyalty in the performance of his duties." *See CBS Corp. v Dumsday, 268 AD2d 350, 353, 702 N.Y.S.2d 248 (1st Dept 2000)*, quoting *Lamdin v Broadway Surface Adv. Corp., 272 NY 133, 138, 5 N.E.2d 66 (1936)*. However, where, as here, the alleged breach of **_fiduciary_** duty is no different than the alleged **_breach_** of **_contract_**, the claims are **_duplicative_**. *Kaminsky v FSP Inc., 5 AD3d 251, 252, 773 N.Y.S.2d 292 (1st Dept 2004)*. Since the NDA expressly governs the legitimacy of Salzman and Carney's disclosure to VSW, a separate claim for breach of fiduciary duty is unnecessary and is dismissed. Similarly, the aiding and abetting breach of fiduciary claim against VSW is duplicative of the tortious interference claim. Again, allegations regarding VSW procuring breaches of the NDA **[\*13]** does not require multiple causes of action.

Since court-ordered mediation did not result in a settlement (*see* Dkt. 71), a new discovery schedule will be set at the next status conference, currently scheduled for April 3, 2014 at 10:30 am. Accordingly, it is

**[\*\*9]** ORDERED that the motion by defendants Michael Salzman, Vertical Search Works, Inc. (VSW) and Kevin Carney to dismiss the Second Amended Complaint is granted in part as follows: (1) the breach of contract, misappropriation, and unfair competition claims survive in accordance with this decision, expect to the extent that plaintiff adMarketplace Inc. cannot prohibit its employees from working for VSW since such a restrictive covenant is unenforceable; (2) the breach of **_fiduciary_** duty and aiding and abetting breach of **_fiduciary_** duty claims are dismissed as **_duplicative_** of the **_breach_** of **_contract_** and tortious interference claims; and (3) the motion is otherwise denied.

Dated: March 28, 2014

ENTER,

/s/ Shirley Werner Kornreich

J.S.C.

**End of Document**

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 94

INDEX NO. 650620/2018

RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 9 of 32

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 94
INDEX NO. 650620/2018
RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 10 of 32



Caution
As of: February 22, 2019 8:18 PM Z

# HEALTHWORLD CORPORATION, Plaintiff, -against- LISA GOTTLIEB, SCOTT BAXTER and SCIENTIAE, LLC, Defendants.

Supreme Court of New York, New York County

April 13, 2004, Decided; April 21, 2004, Filed

Index No. 600641/04

**Reporter**
2004 N.Y. Misc. LEXIS 3281 *; 2004 WL 6035038

HEALTHWORLD CORPORATION, Plaintiff, -against- LISA GOTTLIEB, SCOTT BAXTER and SCIENTIAE, LLC, Defendants.

**Notice:** NOT APPROVED BY REPORTER OF DECISIONS FOR REPORTING IN STATE REPORTS.

**Subsequent History:** Stay denied by *Healthworld Corp. v. Gottlieb, 2004 N.Y. App. Div. LEXIS 8382 (N.Y. App. Div. 1st Dep't, June 10, 2004)*

Affirmed in part and modified in part by *Healthworld Corp. v. Gottlieb, 12 A.D.3d 278, 786 N.Y.S.2d 8, 2004 N.Y. App. Div. LEXIS 14156 (N.Y. App. Div. 1st Dep't, 2004)*

## Core Terms

restrictive covenant, crossed-out, preliminary injunction, lines, solicitation, initials, pages, forensic, services, non-solicitation, indentations, employees, notarized, resigned, name and address, first sentence, Pharmaceuticals, termination, indirectly, deleted, parties, forged, medical education, one year, impressions, untruthful, authentic, documents, email

**Judges:** **[\*1]** BERNARD J. FRIED, J.S.C.

**Opinion by:** BERNARD J. FRIED

## Opinion

**FRIED, J.:**

On March 11, 2004, upon the application of plaintiff Healthworld Corporation, I signed an Order to Show Cause[1],

returnable on March 17th.

Essentially, Healthworld was seeking a preliminary injunction against defendant Lisa Gottlieb, a former employee who was the President of Healthworld's Medical Education USA Division. Ms. Gottlieb had resigned, effective December 19, 2003, and in January 2004 began as President of defendant Scientiae, LLC, which she had formed on November 12, 2003. Also named as a defendant was Scott Baxter, a former Healthworld employee and Vice President of Healthworld's Managed **[\*2]** Care Services, who had resigned on February 19, 2004, and became employed by Scientiae on March 3, 2004.

The application was based upon a "CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT" ("Agreement"), signed by Ms. Gottlieb, which provided in Paragraph 6:

> For a period of one (1) year following the termination of my employment relationship with Healthworld, I agree that I shall not, directly or indirectly, solicit or accept any business from any individual, firm or other entity which shall have obtained the services of, or purchased services from Healthworld during the one year period immediately preceding the effective date of such termination of employment or which shall have been the been the subject of a business solicitation presentation or active solicitations by Healthworld within the six month period prior to the date of such termination. For the same period of one (1) year, I agree that I will not directly or indirectly solicit (or participate in the recruitment of) any current employee of Healthworld to leave the company

---

the absence of extraordinary circumstances a TRO will not be issued unless the opposing parties are given sufficient notice "to permit them an opportunity, if so inclined to appear and contest the application", I declined to entertain the application until such notice was provided. Later that same day, plaintiff's counsel advised that the parties were not going to appear and I signed the OSC; however, I did not issue a TRO.

---

[1] Pursuant to Rule 21 (Rules of the Justices of the Commercial Division, Supreme Court, New York County), which requires that in

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM INDEX NO. 650620/2018

NYSCEF DOC. NO. 94    19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -    RECEIVED NYSCEF: 02/22/2019
Aff. in Reply    Pg 11 of 32    Page 2 of 7

2004 N.Y. Misc. LEXIS 3281, *2

of Healthworld. (Underlined portion crossed-out in the document submitted with the application)[2]

On March 17, 2004, defense opposition papers were submitted, which included Ms. Gottlieb' Affidavit, in which she stated that she had crossed-out the entire sentence in the paragraph 6 relating to non-solicitation of clients, leaving the rest of the Agreement intact.[3] In her Affidavit, she further stated that at an exit interview, on December 19, 2003, when she resigned from Healthworld, she received a copy of the Agreement, however, it "was not a true copy of the Agreement that I had signed".

It was evident that either the Gottlieb Affidavit was truthful and Healthworld had submitted a forged document or the Gottlieb Affidavit was untruthful. This was not mere disagreement, but either the filing of an altered document *or* the filing of a blatantly untruthful Affidavit. With the consent of both sides, I scheduled an evidentiary hearing on the preliminary injunction and stating that it "should be referred, if I find perjury here, for prosecution".

Thereafter the hearing was held on March 22, 24 & 29. Called as witnesses by Healthworld, were Frances Davi, Healthworld's [*5] Director of Human Resources, and John

---

[2] Also attached was a similar agreement signed by defendant [*3] Scott Baxter, which had no cross-outs.

[3] Gottlieb's Affidavit stated:

[A]fter having deleted the language prohibiting the non-solicitation of clients, I too executed the Agreement **after having deleted the entire first sentence** in paragraph "6" thereof prohibiting the non-solicitation of clients. I did not delete the second sentence in paragraph "6" prohibiting the non-solicitation of current employees. I signed and submitted this Agreement to Ms. Davi on or about March 10, 2003, without having the Agreement notarized. (Emphasis added)

* * *

The copy of the Agreement that Ms. Davi provided me upon my departure from Plaintiff **was not a true copy** of the Agreement that I had signed on or about March 10, 2003. First [*4] and foremost, I had deleted the entire first sentence contained in paragraph "6" prohibiting the solicitation of clients or customers of Plaintiff. In the copy that was provided, only a portion, albeit a relatively insignificant portion of the first sentence of paragraph "6", had been deleted. Second, I never notarized the Agreement that I had submitted to Ms. Davi on or about March 10, 2003. In the copy that I was provided, the Agreement was not only notarized (and notarized by Ms. Davi), but was notarized on May 1, 2003, almost two months after I had submitted the signed and revised Agreement. (Emphasis added)

L. Sang, a forensic document examiner. The defense called Lisa Gottlieb, Dr. Stephen Ruskin, Medical Director of Scientiae, and Andrew Sulner, a forensic document examiner.

## FINDINGS OF FACT

Ms. Gottlieb had been an employee of Falk Communications which was acquired in 1999 by Healthworld[4]. Following this acquisition, she became the President of the Medical Education USA Division of Healthworld[5] and signed a three year Employment Agreement, which contained a restrictive covenant, barring her from soliciting or servicing Healthworld's clients for a three year period, ending on July 31, 2001.[6] Thereafter, she received a letter, dated April 15, 2002, from Frances Davi, the Director of Human Resources, giving notice that her Employment Agreement was being terminated, effective July 31, 2002. Ms. Gottlieb signed and returned this letter as requested, retaining a copy, which was received into evidence. On July 31, 2001 and she became an at-will employee.

After July 31st, Ms. Davi made repeated requests that Ms. Gottlieb sign the CONFIDENTIALITY AND RESTRICTIVE AGREEMENT ("Agreement") which Ms. Gottlieb did not do. While Ms. Davi did not recall her reasons Ms. Gottlieb testified it was because: (1) that unlike the earlier Employment Agreement, "[t]his restrictive covenant did not give me anything. There was no guarantee of employment in this restrictive covenant; and (2) "[t]he other thing is that I have been in this business for a long time, and your clients, your relationships with your clients are everything, they truly are, and that for me to sign that, I would never be able to state that I could accept, directly or indirectly — I remember that — any business from any client of Healthworld". [*7]

Finally in the spring of 2003[7], after repeated requests, Ms.

---

[4] Healthworld, a Delaware Corporation, is an international "provider of strategic marketing and communications services to healthcare clients offering them....[services] to create, launch and ...manage their [*6] brands globally and locally..." It provides " full-service medical education specialists to its clients".

[5] The Medical Education Division employed approximately 50 persons and provided its clients, pharmaceutical companies, with "medical education products and services....medical meeting and videos, and web cast for physicians [and] nurses, to teach them about new drugs..or new data...on certain diseases.

[6] This agreement is also the subject of this application.

[7] It is unclear whether the Agreement was executed on March 10, 2003, as Gottlieb testified, or on or about May 1, 2003, the date the Agreement was notarized by Ms. Davi, however, it [*8] is

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM    INDEX NO. 650620/2018

NYSCEF DOC. NO. 94    19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -    RECEIVED NYSCEF: 02/22/2019

Aff. in Reply    Pg 12 of 32    Page 3 of 7

2004 N.Y. Misc. LEXIS 3281, *8

Gottlieb signed the Agreement (Exhibit No. 1). She put it in an inter-office envelope and gave it to her administrative assistant to bring to Ms. Davi. It was Ms. Davi's practice to review such agreements when they were received, before filing them in a locked cabinet; however, she could not recall whether the lines were crossed-out when she received Gottlieb's Agreement. Ms. Davi testified that it was not unusual for an employee to cross-out a paragraph, and when that occurred it was her practice to request that the employee sign a new document, but she did not recall doing that with the Gottlieb Affidavit. Ms. Davi, notarized the Agreement, outside of Ms. Gottlieb's presence, because she "recognize[d] her signature," and placed it in the locked file cabinet, to which only she and Kevin Zhang, her assistant, had keys. The Agreement was stapled when Ms. Davi received it, and she unstapled and re-stapled it several times to be photocopied, faxed, and emailed.

Ms. Gottlieb acknowledged that the handwritten name and address on page 1 was written by her. She also acknowledged that it was her signature on page 3. However, her testimony, which I do not credit, was that she struck out the "whole first sentence about non-solicitation" of clients, leaving intact the last sentence prohibiting solicitation of employees. Ms. Gottlieb further testified that page 2 of this exhibit was not the page on which she had crossed-out the first sentence of paragraph 6, on page 2 of the documents she signed because "when I do cross-outs especially in something as a legal document, what I do, I go line by line. At the end there's a little loopy thing, kind of like an E, which is an editor's mark that means delete." Exhibit No. 1 contained no such marks; furthermore, she said that the initials did not appear to be hers. Also, she said that the initials were not hers. Ms. Gottlieb signed the Agreement because she was seeking salary increases for some of her key employees, and that Ms. Davi had told her that Steven Girgenti, the Chairman and CEO of Healthworld, would not discuss **[*9]** these raises with her unless she signed the restrictive covenant.[8] Ms. Davi

could not recall such conversation, however, she testified that it "may" have occurred. Whatever her reason, I find that the document she signed was, in fact, Exhibit No. 1, and I reject her testimony to the contrary.

In August 2003, Healthworld was purchased by another corporation, WPP. In conjunction with this purchase Ms. Davi was required to conduct an audit of all employee files, to determine if there were unaltered restrictive covenant agreements signed by all employees. During the course of this audit, in October or November 2003, she removed Ms. Gottlieb's Agreement from the locked cabinet and realized that it contained the three crossed-out lines, which she had no "reason to believe **[*11]** they weren't there in May". On November 26, 2003, Ms. Davi brought Ms. Gottlieb an unaltered restrictive covenant agreement. However, Ms. Gottlieb refused to sign the clean copy because, as she testified, since the summer she had heard that she was going to be replaced and did think it was in her "interest" to sign the new document. At this meeting she was not given a copy of the signed original, nor did she request to see a copy of it.

It was around this time that Ms. Gottlieb decided to leave Healthworld. She incorporated Scientiae on November 12, 2003, began searching for office space, and "made certain decisions about which pieces of business [she was] hoping to have at [Scientiae]", which included an intention to "ask Kos Pharmaceutical to give me business". She also expected to do business with Allergan, another Healthworld client. On December 2, 2003, Ms. Gottlieb submitted her letter of resignation, effective December 19th. At her December 19Th exit interview Ms. Gottlieb asked for a copy of the restrictive covenant agreement which she had signed. Ms. Davi turned to the filing cabinet and gave her a copy of the Agreement. On reading it, Ms. Gottlieb testified that she immediately **[*12]** "knew what was on page two was not what I had done", however, she did not say anything to Ms. Davi, or express her belief that she had been given a false document.

---

undisputed that Ms. Gottlieb filled out page 1 and signed page 3. At issue is page 2.

[8] Ms. Gottlieb testified that after she signed the Agreement on March 10th, she met with Mr. Girgenti, who approved the raises. There was no discussion of the Agreement. She then left and drove, with one of her employees, Dr. Stephen Ruskin, then a Senior Vice President and Medical Director of Healthworld, and currently the Medical Director at Scientiae, to Newark Airport for a business trip to Florida to meet with one of her Healthworld clients, Kos Pharmaceuticals. En route, according to Ms. Gottlieb, she had a conversation on her cell phone with Ms. Davi, who said that the raises, including Dr. Ruskin's were approved. It was her testimony that she then told him that he got his raise, but that she "had to sign the agreement in order to do I, but don't worry, I crossed-out all the important stuff."

---

Dr. Ruskin testified that he had traveled March 10th with Ms. Gottlieb to Newark Airport, and that, **[*10]** en route, she told him that she obtained his pay raise because "she signed a document she had been resisting for a long time....but that she had crossed-out all the important stuff on page two except for the last line of that paragraph". He did not mention the cell phone. This testimony was objected to on hearsay grounds, and it was conceded to be hearsay. However, I accepted it and stated that I would allow argument on whether to "totally disregard it." Certainly, this statement, which is pure hearsay, must be stricken; however, even if not stricken, I do not credit the testimony of Dr. Ruskin that over one year later he actually recalled that up to the "last line" of the paragraph was stricken from "page two".

This testimony was not believable. To me it is inconceivable, having heard and observed her demeanor, as a strong, assertive witness, that if the Agreement she was given at the exit interview truly had a forged page 2, that she would have said and done nothing. Her explanation that, although she was "shocked", she did not want to "make a stink or do anything until [she] talked [her] lawyer" is unpersuasive. She had just signed a six-year lease for Scientiae and was planning to begin doing business in January, Yet she said nothing to Ms. Davi, thereafter did nothing to challenge or question this so-called false restrictive covenant, which she acknowledged could impede her plans for Scientiae and could result in a lawsuit.

Healthworld had not planned to call a document examiner; however, prior to the commencement of the hearing, as ordered, the parties named their witnesses, and the defense specified Peter Tytell, a forensic document examiner. At the end of the testimony on the first day of the hearing, the defense requested [*13] an adjournment to call Mr. Tytell and requested that he be provided with the original Agreement, Healthworld opposed this request for further testimony, however counsel stated that if I granted the application, Healthworld "would like the opportunity to do the same". I adjourned the hearing to March 24th for Mr. Tytell to examine the Agreement and for Healthworld to make similar arrangements.

Thereafter, on March 24th, Ms. Gottlieb's attorney stated that he was not calling Mr. Tytell as an expert witness, because Mr. Tytell had told counsel that he "was unable to conclude one way or another as to whether those are or are not Ms. Gottlieb's initials". Thus, according to defense counsel "[h]e had no probative testimony to give on the issue we had sought him out". At this point, Healthworld was permitted to call John L. Sang, a forensic document examiner, who had been contacted only because of the expectation that Mr. Tytell would be testifying. Otherwise, there would have been no expert testimony at this hearing. This is not only ironic, but significant to my conclusion that the Agreement (Exhibit No. 1) is authentic, and not a false document as Ms. Gottlieb testified.

John L. Sang was qualified [*14] as a forensic document examiner. He testified that, to a "reasonable degree of professional certainty", the three pages of the Agreement were on top of each other when Ms. Gottlieb handwrote her name and address on page 1, and when the three lines, with the initials "LG" were drawn through paragraph 6 on page 2. He reached this conclusion by the use of an electrostatic detection apparatus (ESDA), oblique lighting and visual and microscopic analysis. Mr. Sang did not compare the initials "LG" on page two with other documents, containing Ms.

Gottlieb's initials received at trial.

ESDA is a method which allows the forensic document examiner to obtain latent impressions on a document, in this case, to determine if the words "Lisa Gottlieb, 100 Riverside Drive #15D, NY, NY 10024", which were handwritten on page 1, appeared on pages 2 and 3. To put it differently, it allowed Mr. Sang to "lift" such latent impressions from pages 2 and 3. It also allowed Mr. Sang to "lift" the latent impressions caused by the three crossed-out lines on paragraph 6, and the initials "LG", from page 3. The "lift" process is not complicated: the examiner places the original document to be examined on the electrostatic [*15] instrument, and covers it with a plastic transparency. An electronic charge is introduced across the document, which creates images of indentations (and other markings) on the transparency. Blowups are made of these transparencies and examined. The oblique lighting and visual and microscopic examination is also uncomplicated: the original document is illuminated with oblique light at an angle almost parallel to the plane of the document. The document is then rotated so that "when that light hits the indentation, it casts a shadow....[W]hen it casts that shadow, it allows the original pen trace to become visible".

The ESDA examination disclosed that Ms. Gottlieb's name and address appeared on pages 2 and 3, exactly as written on page 1 of the Agreement. It also demonstrated that the three crossed-out lines, and initials "LG", appeared on page 3, exactly as written on page 2. (The transparencies and blowups were received into evidence and reviewed by me.) The oblique lighting examination confirmed these findings. It was now established scientifically that page 2 of the Agreement was authentic.

Following Mr. Sang's testimony, I granted a continuance to permit defense counsel to consult with Mr. [*16] Tytell concerning the ESDA test; although it was not clear whether Mr. Tytell actually had performed ESDA testing of the Agreement. Counsel also sought the continuance to gain an understanding of the "science involved in this test". When the hearing continued on March 29th, Healthworld called not Mr. Tytell but Andrew Sulner, another forensic document examiner.

Mr. Sulner was qualified, over objection, as an expert witness[9]. He agreed with Mr. Sang's conclusions, and stated

---

[9] Although Mr. Sulner is a forensic document examiner with over thirty years experience, who had been qualified "several hundred" times in various state and federal courts, Healthworld objected to his being received as an expert, citing to an unpublished opinion in which he was criticized by Justice Lewis R. Friedman, who wrote:

**FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM**
INDEX NO. 650620/2018
NYSCEF DOC. NO. 54
RECEIVED NYSCEF: 02/22/2019

19-01435-jlg   Doc 5-38   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit KK -
Aff. in Reply   Pg 14 of 32

2004 N.Y. Misc. LEXIS 3281, *16

that they were "absolutely a logical explanation for how those indentations occurred". He also testified that he performed a video spectral comparator test on the inks and concluded, that the black ink on page 2 was not the same black ink on pages 1 and 3. (This was undisputed, and Healthworld had sought, unsuccessfully, for it to be the subject of a stipulation.) He also testified that he had reached a "preliminary" conclusion that "there is an issue as to whether or not these initials ["LG"] were in fact signed by Ms. Gottlieb". This led him, as he put it, to "rais[e] an issue as to whether or not the indentations occurred in the manner that one would summarily expect them to occur", and he then constructed a theory that [*17] someone could have made a photocopy of a clean page 2, and "place[d] it over page one[sic], and then simply carefully go over the line on page — on the photocopy of page two, and carefully go over the initials, don't have to go over all or even lightly, I would have created an indentation of those three lines and the initials or partial indentations on this page one [sic]".

This was disquieting since it ignored the fact that the crossed-out lines on page 2 line up completely with the ESDA lift on page 3, which page matches perfectly with the name and address on pages 1 and 2. When asked about this, his theory changed and he assumed "hypothetically" that "they were filled out separately", and "not stapled together". And he added that that "it is conceivable, it is possible for someone to..trace over the letters carefully and it has be careful because...you only have one shot at this. If you screw it up, it is finished. The game is over." On the other hand, he acknowledged that if the pages have been together, "then the possibility that we are addressing here is nonexistent, does not apply, if that's the case."

However, that is the case - the pages were stapled together when signed, and all the indentations line up precisely page to page to page. Thus, I reject Mr. Sulner's conjectural theories, and find that when Ms. Gottlieb wrote her name and address on page 1, the impressions she made [*19] by pressing her pen down went upon pages 2 and 3, and when she crossed-out and initialed the three lines on page 2 - whether at that time, or at a later time - it made an impression upon the attached

---

"[t]his court has a great deal of difficulty in crediting the testimony of Andrew Sulner....***It is significant that Mr. Sulner's overall testimony is questionable at best. He constructed a theory of the case and when the facts were proven to be different, simply adjusted his testimony to fit the 'new' facts. The court does not find him to be a credible witness...." (Deutsch v. Deutsch, Index No. 72326/92, Sup. Ct., NY Cty [1997]). Responding to this objection, Ms. Gottlieb's counsel provided me with cases in which [*18] Mr. Sulner was received as a witness; however, they did not rebut the specific findings made by Justice Friedman. Nonetheless, I accepted Mr. Sulner as an expert witness.

---

page 3.

I do not believe Ms. Gottlieb's testimony that she crossed-out a different portion of paragraph 6, submitted it to Ms. Davi, and failed to keep a copy of it. She demonstrated at the hearing that she kept records of important documents[10], thus it is highly unlikely that she would not have kept a copy of the restrictive covenant agreement. Additionally, to credit her testimony would require that I find that Healthworld had replaced the original page 2 with a forged page 2. And that Healthworld had not just substituted a forged page, but that the substituted page itself contained other crossed-out lines in the non-solicitation restrictive covenant. This makes no sense. Under this scenario, Healthworld would not only have crossed-out the three lines and forged the initials "LG" on page 2, but carefully lined up the three pages to ensure that future forensic examination would demonstrate that the page 1 was signed on top of pages 2, which was on top of page 3. And, then Healthworld would [*20] have crossed-out the three lines at the end of the first sentence. Furthermore, if the pages were separated when originally signed, why would Healthworld even bother to trace over the name and address on page 1, if not for future forensic testing, and having done so, why would Healthworld object to expert testimony? Would not Healthworld have been the first to call an expert? However, if the pages were together when signed, and page 2 was replaced by a forgery, the original lines Ms. Gottlieb claims were crossed would have been revealed by the ESDA on page 3 There were no such lines on page 3; only the three lines crossed-out on the Agreement.

Consequently, the credible evidence, clearly and convincingly, establishes that the Agreement -- Ex. No. 1 — is **exactly** the document signed by defendant Lisa Gottlieb.

In addition to the issue regarding the authenticity of the Agreement, there are other facts relating to Ms. Gottlieb which are relevant to this application for a preliminary injunction: the 1999 "Executive Employment Agreement for Lisa Gottlieb", which terminated on July 31, 2002, also contains a "Non-Competition" provision (para. 7) barring her from soliciting, directly or indirectly, business from, or

---

[10] A number of documents, which had been maintained by Ms. Gottlieb, were received into evidence: Ex. A - Memorandum, dated November 30, 2001 from Stuart Diamond; Ex B - Letter, dated, April 15, 2001 from Fran Davi; Ex C - twenty-three "routine documents" she signed while at Healthworld; Ex D - email, dated April 28, 2003, to Gottlieb from Mr. Girgenti's executive assistant; Ex E - email, dated August 22, 2003, sent by Gottlieb to Mr. Diamond; Ex F - email dated, October 27, 2003, to Gottlieb from Ms. Davi; and Ex G - email, dated December 1, 2003, [*21] from Gottlieb to Mr. Girgenti and Mr. Diamond.

rendering any services for clients of Healthworld or clients which had been the subject of solicitation presentations, for a period of eighteen months after "she ceases to be employed by [Healthworld] whether under this [Executive Employment] Agreement or otherwise." As stated earlier she became an at-will-employee until her resignation on December 19th. Prior to her resignation, when she was forming Scientiae, defendant Baxter, then a fellow employee at Healthworld, assisted her "as a friend" in starting her new company: he referred her to a real estate agent and helped her [*22] to "understand" computers. According to Ms. Gottlieb, they did not discuss the possibility of his joining her new company; it was not until February 20, 2003 that she spoke to him about this. Additionally, Scientiae currently employs four former Healthworld employees - George Liao, Marissa Cimbal, Christina Hosmer and Nancy Cuevas. Ms. Gottlieb testified these persons had resigned from Healthworld "on the understanding that they would have a job with Scientiae". They had "approached" her because they were unhappy; she had not solicited them.

Scientiae has only two clients: Kos Pharmaceutical, Inc. and Allergan, both of whom were, and presently are, clients of Healthworld during Ms. Gottlieb's employment.

### B. Scott Baxter

Defendant Baxter was not called as a witness by either party, although he was available throughout the hearing. According to his affidavit, he was an employee at Healthworld from January 22, 2002, through March 3, 2004, While he was subject to a restrictive covenant, identical to the one Ms. Gottlieb signed, no evidence was offered at the hearing to establish that he violated the terms of his agreement, which he had denied in his affidavit.

### CONCLUSIONS OF LAW

This preliminary [*23] injunction hearing was conducted to determine whether the Agreement, upon which this action is based, was a forged document, or whether the denial that it was the Agreement signed by Ms. Gottlieb was untruthful. It was agreed by the parties that if I found the Agreement to be false, that this request for a preliminary injunction should be denied. On the other hand, it was also agreed that if I found Ms. Gottlieb to be untruthful, and the Agreement authentic, then the request for a preliminary injunction should be granted. Therefore, since I conclude that Agreement is authentic and contains the unstricken not portions of the non-solicitation restrictive covenant in paragraph 6, a Preliminary Injunction is granted against Lisa Gottlieb. It is also granted

against Scientiae, the corporate defendant, even though it is not a party to the restrictive covenant. It is evident that to allow Scientiae, Ms. Gottlieb's own corporation, to continue doing business with Kos and Allergan, would enable Ms. Gottlieb to "circumvent the restrictive covenant" (*Hudson Chromium Company, Inc. v. Pollack, 50 AD2d 771, 377 N.Y.S.2d 49 [1st Dept., 1975]*). However, with regard to defendant Baxter, since there has been not been the necessary showing to warrant the issuance of a preliminary injunction, [*24] the request for this provisional remedy is denied.

Having found Ms. Gottlieb's testimony to be untruthful concerning the 2003 Agreement, which contains the restrictive covenant set forth in paragraph 6 prohibiting her for one year after the termination of her employment, from directly or indirectly, soliciting or accepting any business from one of Healthworld's clients, there is no need to decide, at this time, the enforceability of the earlier 1999 agreement. Indeed, my decision to grant a Preliminary Injunction is limited to the conclusion that Healthworld has made a convincing showing: (1) of a likelihood of success under the paragraph 6 of the 2003 Agreement; (2) of irreparable injury; and (3) that the equities are in its favor (*CPLR 6301*; Siegel, New York Practice - Practitioner Treatise Series [3d ed.], pp.497-500), Since the parties did not consent that the evidentiary hearing on the preliminary injunction could be considered a final trial on the merits, other issues will await the final trial.

The terms of the 2003 restrictive covenant are enforceable under *BDO Seidman v. Hirshberg, 93 NY2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854(1999)*, as to both Kos and Allergan, since Ms. Gottlieb used client relationships developed and maintained during her employment at Healthworld. [*25] Ms. Gottlieb testified that in December 2002, she and a number of other employees of Healthworld devoted 1,839 hours in a "pitch" to Kos, resulting in "several million dollars of business". While she had a prior relationship with Aaron Berg, who became Kos's Director of Marketing, she was "surprised" when she attended a meeting at Kos and found him there, "because I had not been aware that he had recently moved to Kos Pharmaceuticals". Therefore, it cannot be seriously contended that Kos was somehow Ms. Gottlieb's personal client. With regard to Allergan, there was no testimony concerning a prior relationship. Moreover, the one year bar is not unreasonable (e.g., *Chernoff Diamond Co. v. Fitzmaurice, Inc., 234 AD2d 200, 651 N.Y.S.2d 504 [1st Dept., 1996]*)(two year restriction). Since Ms. Gottlieb acknowledges actively pursuing these two former clients, failure to issue the requested injunction will cause irreparable injury to Healthworld, that, in the absence of a restraint upon [Ms. Gottlieb'] solicitation of plaintiffs' clients, plaintiff

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 94

INDEX NO. 650620/2018

RECEIVED NYSCEF: 02/22/2019

19-01435-jlg   Doc 5-38   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit KK -
Aff. in Reply   Pg 16 of 32   Page 7 of 7

2004 N.Y. Misc. LEXIS 3281, *25

would likely sustain a loss of business impossible, or very difficult, to quantify" (*Willis of New York, Inc. v. DeFelice*, 299 A.D.2d 240, 750 N.Y.S.2d 39 [1st Dept., 2002]).

*CPLR 6312 (b)*, requires that "prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in amount to be fixed by the court". Therefore, **[*26]** prior to my signing the Preliminary Injunction, Healthworld will be required to submit a bond in the amount of the bond, which I am fixing at Three Hundred and Fifty Thousand ($350,000) Dollars[11], conditioned that "if it is finally determined that [Healthworld] was not entitled to an injunction, [it] will pay to the defendant[s] all damages and costs which may be sustained by reason of the injunction."

Accordingly, the Preliminary Injunction will issue in a separate Order, upon the submission of the specified undertaking with the Clerk of the Court. It is therefore ORDERED:

(1) That upon submission of the undertaking specified, defendants Lisa Gottlieb and Scientiae will be enjoined until December 19, 2004 from, directly, or indirectly, soliciting **[*27]** or accepting business from, or rendering services of the type rendered by Healthworld to, (a) any current client of Healthworld; (b) any client of Healthworld with whom Lisa Gottlieb had contact while employed by Healthworld, including but not limited to, Allergan, Inc. and Kos Pharmaceuticals; and (c) anyone who has been a Healthworld client in during the one year period immediately preceding December 19, 2003; and it further ORDERED

(2) That plaintiff Healthworld shall submit, prior to the issuance of such Preliminary Injunction, submit to the Clerk of this Court, an undertaking in the amount of Three Hundred and Fifty Thousand ($350,000), pursuant to *CPLR 6312(b)*; and it is further ORDERED.

(3) That the defendants are to answer the Complaint within 10 days of the entry of this decision; and it is further ORDERED

(4) That the parties pick up their exhibits in Room 300, Part 60, as soon as convenient.

Finally, a copy of decision, is being forwarded to the New York County District Attorney for whatever action may be

deemed appropriate.

SO ORDERED.

DATED: APR 13 2004

/s/ Bernard J. Fried

J.S.C.

---

**End of Document**

---

[11] There was no discussion of the amount of undertaking which should be fixed in the event the preliminary injunction was granted. Therefore, I have fixed this sum based upon the Gottlieb Affidavit that during the first quarter of 2004 Scientiae's business with Kos and Allergan totaled $85,375, and multiplied this by 4 to annualize the proceeds from these two clients. Written application on notice, if deemed appropriate, can be made concerning this undertaking.

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM

NYSCEF DOC. NO. 94

INDEX NO. 650620/2018

RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 17 of 32

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
INDEX NO. 650620/2018
NYSCEF DOC. NO. 94
19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 18 of 32
RECEIVED NYSCEF: 02/22/2019

No *Shepard's* Signal™
As of: February 22, 2019 4:20 PM Z

## *Lionella Prods., Ltd. v Mironchik*

Supreme Court of New York, New York County

July 13, 2012, Decided; July 19, 2012, Filed

108693/08

### Reporter

2012 N.Y. Misc. LEXIS 3472 *; 2012 NY Slip Op 31902(U) **

[**2] LIONELLA PRODUCTIONS, LTD and ANDREW BARRETT, Plaintiffs, -against- JAMES MIRONCHIK, Defendant. Index No. 108693/08

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

## Core Terms

cause of action, programming, ***partial***, nondisclosure, unfair competition, ***covenant***, theater, hired, restrictive ***covenant***, plaintiffs', commerce, music, business relationship, trade secret, Contractor, parties, plugin, synthesizer, Trade-Mark, deposition, receptor, software, compete, argues, host

**Judges:** [*1] BARBARA R. KAPNICK, J.S.C.

**Opinion by:** BARBARA R. KAPNICK

## Opinion

### DECISION/ORDER

### BARBARA R. KAPNICK, J.:

This action arises out of a Non-Disclosure Agreement (the "Agreement"), signed on July 6, 2006, by plaintiff Andrew Barrett ("Barrett"), a music synthesizer programmer, composer, arranger, orchestrator and producer, on behalf of plaintiff Lionella Productions, Ltd. (the "Company"), and defendant James Mironchik ("Mironchik"), an independent contractor. The Agreement generally concerned the use of plaintiffs' musical theater synthesizer procedures and methodologies as used in Broadway shows.

Background

The Agreement provides as follows:

FOR GOOD CONSIDERATION, and in consideration of being engaged as an Independent Contractor (Contractor) from time to time by Lionella Productions Ltd. (Company), the undersigned hereby agrees and acknowledges:

1. That during the course of my engagement(s) there may be disclosed to me certain trade secrets of the Company; said trade secrets consisting but not [**3] necessarily limited to:

(a) Technical information: Methods, processes, formulae, compositions, systems, techniques, inventions, machines, computer programs and research projects. Programming techniques (specifically regarding [*2] the use of PC-based, "Host/Plugin" programming), sample data and programming data.

(b) Business information: Customer lists, pricing data, sources of supply, financial data and marketing, production, or merchandising systems or plans.

2. I agree that I shall not during, or at any time after the termination of my engagement(s) with the Company, use for myself or others, or disclose or divulge to others including future employees, any trade secrets, confidential information, or any other proprietary data of the Company in violation of this agreement.

3. Contractor shall not bid or compete for jobs or contracts with clients or persons introduced to Contractor by Company.

4. PC-based, "Host/Plugin" programming shall not be used by Contractor for live theater programming jobs without prior written consent from Company.

5. Upon termination of my employment from the Company:

(a) I shall return to the Company all documents and property of the Company, including but

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM    INDEX NO. 650620/2018
NYSCEF DOC. NO. 94    RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 19 of 32

2012 N.Y. Misc. LEXIS 3472, *2; 2012 NY Slip Op 31902(U), **3
Page 2 of 8

not necessarily limited to: sample data, programming methods, drawings, blueprints, reports, manuals, correspondence, customer lists, computer programs, and all other materials and all copies thereof [**4] relating in any way to the Company's [*3] business, or in any way provided to me by Company. I further agree that I shall not retain copies, notes or abstracts of the foregoing.

(b) The Company may notify any future or prospective employer or third party of the existence of this agreement, and shall be entitled to full injunctive relief for any breach.

(c) This Agreement shall be binding upon me and my personal representatives and successors in interest, and shall inure to the benefit of the Company, its successors and assigns.

(d) This Agreement shall be governed in accordance with the laws of the State of New York.

Mironchik worked as Barrett's assistant from July 2006 to February 2007 on two Broadway shows: *Sister Act* (California Company) and *Wicked* (Los Angeles Company).

On June 29, 2007, almost one year after signing the Agreement, Mironchik wrote the following e-mail to Barrett:

Andy:

I trust that all is well and that things are moving forward well for you with "Mermaid[.]"

I've been asked to work on a project that would include using the Open Labs Neko keyboard. I trust that this would not violate our non-disclosure agreement. Could you please confirm this ASAP.

Thank you.

[**5] On June 30, 2007, Barrett responded with the following [*4] e-mail:

Hi Jim,

Paragraph 4 of the non-disclosure agreement you signed (7/6/06) says specifically that you agree not to use PC-based host/plugin for live theater programming jobs. The Open Labs Neko is basically a keyboard with a PC and monitor built in. If there's any use of plugins it would fall under this paragraph. However, if you give me some details about the software you intend to use and the details about the production I can tell you if this is something that would raise an issue for me.

Best Regards,

Andy

On July 3, 2007, Mironchik, in response to a call from

Barrett, wrote the following e-mail, which states, in relevant part:

Honestly, it seems that we need to discuss a change to the agreement in that I certainly do not want to have to ask your permission every time I'm considering or being considered for a project where the Neko (or some other similar current or future hardware-software combination) has been requested or is being considered; either by designers, orchestrators, Music Supervisors, or anyone in or of the music department of any given production, or frankly if I feel that a Neko or Receptor device is worth considering for any given project.

As we are talking about [*5] commercially available hardware and software, there is therefore nothing of a proprietary nature or otherwise unique to your system. Likewise, nothing in violation of any copyright you might own or the use of "trade secrets[.]" I have no intent nor desire to mimic your setup with laptops, a Firebox, and software, despite the individual [**6] elements' commercial availability.

I also long ago realized that it was an error not to include a clause in the agreement governing commercially available hardware and software (e[.]g[.] Neko, Receptor, etc). In retrospect, it seems that that should have been an obvious exception. I also hope that the spirit of paragraph 4 was to keep a proper control over your research and development, and that it was not to bring into question any future use of an independently developed hardware-software system, however similar to the one that you've pioneered.

By e-mail dated July 5, 2007, Barrett responded to Mironchik, in relevant part, as follows:

What you are proposing goes to the essence of the contract. You agreed that you would not use the information or techniques covered by the agreement for yourself or for others. The contract is specific about this and I [*6] urge you not to put yourself in a position where you are in breach. Please be advised that I intend to enforce my rights to the full extent of the law. In addition, I will not hesitate to contact your employer and advise them of the existence of our agreement, and their potential liability in hiring you.

However, as stated in paragraph 4, I will consider sanctioning jobs where you want to use this technology on a case by case basis. Under no circumstances will I consider renegotiating our contract.

The Verified Complaint, dated May 29, 2008, (the "Complaint") alleges that Mironchik violated the Agreement by allegedly disclosing confidential proprietary information to Randy Cohen ("Cohen"), one of the Company's chief

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 54
INDEX NO. 650620/2018
RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 20 of 32    Page 3 of 8

2012 N.Y. Misc. LEXIS 3472, *6; 2012 NY Slip Op 31902(U), **6

competitors, and by unfairly [**7] competing for jobs that the Company should have rightfully obtained. Accordingly, the Complaint sets forth causes of action for:

(1) breach of the Agreement (first cause of action);

(2) an accounting (second cause of action);

(3) a permanent injunction enjoining defendant from (a) using plaintiffs' trade secrets, (b) divulging plaintiffs' trade secrets to third parties; (c) competing with plaintiffs for contracts with plaintiffs' clients, and (d) [*7] using PC-based "Host-Plugin" programming for live theater programming jobs without prior written consent (third cause of action);

(4) compensatory and punitive damages for unfair competition in violation of the Lanham Act (28 USC § 1338) (fourth cause of action); and

(5) intentional interference with plaintiffs' prospective business opportunities with clients in music, theater and entertainment industries, including music synthesizer programming for Broadway musicals (fifth cause of action).

By Decision/Order dated June 7, 2010 (motion seq. no. 004), this Court granted defendant's motion for partial summary judgment to the extent of dismissing the third cause of action for a [**8] permanent injunction. That portion of the motion which sought to dismiss the first cause of action for breach of the Agreement was denied as premature with leave to renew, if deemed appropriate, after the completion of discovery.

Depositions of both Barrett and Mironchik have now been conducted and the parties have exchanged additional documents.[1]

Mironchik now moves for an order, pursuant to CPLR 3212, granting him summary judgment dismissing plaintiffs' Complaint in its entirety on the grounds that the Agreement is defective and incapable of being corrected.

Discussion

A movant seeking summary judgment "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues

of fact from the case." Winegrad v. New York Univ. Med. Ctr., 64 NY2d 851, 853, 476 N.E.2d 642, 487 N.Y.S.2d 316 (1985) (internal citation omitted). Once this showing is made, the burden shifts to the opposing party to produce evidentiary proof in [**9] admissible form sufficient to establish the existence of triable issues of fact. Mere conclusions, expressions of hope and unsubstantiated allegations are insufficient to defeat a summary judgment motion. Zuckerman v. City of New York, 49 NY2d 557, 562, 404 N.E.2d 718, 427 N.Y.S.2d 595 (1980).

First Cause of Action - Breach of Contract

Defendant argues in the first instance that the Agreement is per se unreasonable because it contains absolutely no time [*9] or geographic limitations, and is, therefore, unenforceable.[2] See, e.g., Good Energy, L.P. v. Kosachuk, 49 AD3d 331, 332, 853 N.Y.S.2d 75 (1st Dep't 2008); Garfinkle v. Pfizer, Inc., 162 AD2d 197, 556 N.Y.S.2d 322 (1st Dep't 1990).

Plaintiffs, on the other hand, urge that the Agreement is reasonable and enforceable and only needs this Court to "blue-pencil" the Agreement to include a time restriction. Plaintiffs suggest that a three (3) year period be imposed and that the lack of a geographic limit is reasonable because live theater spans the globe.

[**10] In reply, defendant argues that there is no basis for the Court to use its "judicial blue pencil" to insert an arbitrary three (3) year time restriction, or to uphold the purported global reach of the Agreement.

"Generally negative covenants restricting competition [*10] are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." Reed, Roberts Assoc. v. Strauman, 40 NY2d 303, 307, 353 N.E.2d 590, 386 N.Y.S.2d 677 (1976).

The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and

---

[1] The Court notes that the Note of Issue has not yet been filed and that counsel for plaintiff argued on the record that he did not believe discovery was complete because [**8] there are still outstanding document demands and because he wants to depose non-party Mr. Cohen, although it does not appear that Randy Cohen was ever subpoenaed.

[2] There can be no dispute that, the Agreement is silent as to the time and geographic limitations of the restrictive covenant; this was confirmed by Barrett, who testified during his deposition that he did not specify time or place restrictions in the Agreement. (Barrett Dep. 108:2-9, Aug. 12, 2010.) Barrett also testified that he prepared the Agreement, without the assistance of counsel. (Barrett Dep. 58:7-59:16.)

(3) is not injurious to the public. **A violation of any prong renders the covenant invalid**.

*BDO Seidman v. Hirshberg, 93 NY2d 382, 388, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999)* (emphasis supplied) (internal citations omitted).

> New York has adopted this prevailing standard of reasonableness in determining the validity of employee agreements not to compete. "In this context a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee."

*Id*. (quoting *Reed, Roberts Assoc., 40 NY2d at 307*).

 [**11] Here, the Court finds that the lack of any time restriction in the Agreement  [*11] is unreasonable. *See, e.g., EarthWeb, Inc. v. Schlack, 71 F. Supp 2d 299, 313 (SDNY 1999)* (holding that a one-year duration of a restrictive covenant is too long given the fast paced nature of the Internet technology industry and its lack of geographical borders), *aff'd*, *2000 U.S. App. LEXIS 11446, 2000 WL 1093320 (2d Cir. 2000)*. This is especially true in light of paragraph 4 of the Agreement, which purports to permanently burden Mironchik with the task of seeking and obtaining prior written consent, from Barrett before ever using any PC-based, host/plugin programming in live theater programming.

Nevertheless, the Court must still consider whether it has the power to partially ***enforce*** the overly-broad restrictive ***covenant***. *BDO Seidman, 93 NY2d at 394-95*; *Karpinski v. Ingrasci, 28 NY2d 45, 51-52, 268 N.E.2d 751, 320 N.Y.S.2d 1 (1971)*. The Court of Appeals has described this judicial power as follows:

> The issue of whether a court should cure the ***unreasonable*** aspect of an overbroad employee ***restrictive covenant*** through the means of ***partial*** enforcement, or severance has been the subject of some debate among courts and commentators. A legitimate consideration against the exercise of this power is the fear that employers will use their superior bargaining  [*12] position to impose unreasonable anti-competitive restrictions, uninhibited by the risk that a court will void the entire agreement, leaving the employee free of any restraint. The prevailing, modern view rejects a per se rule that ***invalidates*** entirely any overbroad employee agreement not to ***compete***. Instead, when, as [in *BDO*  [**12] *Seidman*], the ***unenforceable*** portion is not an essential part of the agreed exchange, a court should conduct a case specific analysis, focusing on the conduct

of the employer in imposing the terms of the agreement. Under this approach, if the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified.

*BDO Seidman, 93 NY2d at 394* (internal citations omitted)

Whether the unenforceable portion "is an essential part of the agreed exchange depends on its relative importance in the light of the entire agreement between the parties." *Ashland Mgt. Inc. v. Altair Invs. NA, LLC, 59 AD3d 97, 106, 869 N.Y.S.2d 465 (1st Dep't 2008)* (internal citation omitted), *aff'd*  [*13] *as modified*, 14 NY3d 774, 925 N.E.2d 581, 898 N.Y.S.2d 542 (2010).

In *Ashland Management*, the Court found that "the essential part of the agreements is not their duration but the prohibition against using, copying or removing confidential information." *Id. at 106*. Here too, the essential part, of the Agreement is not its duration or lack thereof, but the prohibition against using any PC-based, host/plugin programming while working in live theater. Therefore, since the unenforceable portion of the Agreement (the unlimited time duration) is not essential, the Court can go on to determine whether partial enforcement is justified here.

 [*13] In *BDO Seidman*, the Court of Appeals described the factors that weigh in favor of ***partial*** enforcement:

> Here, the undisputed facts and circumstances militate in favor of ***partial*** enforcement. The ***covenant*** was not imposed as a condition of defendant's initial employment, or even his continued employment, but in connection with promotion to a position of responsibility and trust just one step below admittance to the partnership. There is no evidence of coercion or that the Manager's Agreement was part of some general plan to forestall competition. Moreover, no proof was submitted that BDO imposed  [*14] the covenant in bad faith, knowing full well that it was overbroad.

*BDO Seidman, 93 NY2d at 395*.

On the other hand,

> [f]actors weighing against ***partial*** enforcement are the imposition of the ***covenant*** in connection with hiring or continued employment - as opposed to, for example, imposition in connection with a promotion to a position of responsibility and trust - the existence of coercion or a general plan of the employer to forestall competition,

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM    INDEX NO. 650620/2018

NYSCEF DOC. NO. 94    19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 22 of 32    RECEIVED NYSCEF: 02/22/2019

2012 N.Y. Misc. LEXIS 3472, *14; 2012 NY Slip Op 31902(U), **13

and the employer's knowledge that the covenant was overly broad.

*Scott, Stackrow & Co., C.P.A.'s P.C. v. Skavina, 9 AD3d 805, 807, 780 N.Y.S.2d 675 (3d Dep't 2004)*, lv. den., 3 NY3d 612, 821 N.E.2d 972, 788 N.Y.S.2d 667 (2004); see also *Gilman & Ciocia, Inc. v. Randello, 55 AD3d 871, 872, 866 N.Y.S.2d 334 (2d Dep't 2008)* (affirming lower court's refusal to partially **_enforce_** restrictive **_covenant_** where employer failed to demonstrate "the absence of overreaching, the coercive use of dominant bargaining power, or other anticompetitive misconduct"); *Fullman v. R&G Brenner Income [**14] Tax Consultants, 24 Misc. 3d 1214[A], 897 N.Y.S.2d 669, 2009 NY Slip Op 51451[U] at *6 [Sup Ct, NY Co 2009]* (finding a restrictive covenant to be the product of superior bargaining power when it was a condition of initial employment); *Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd., 8 Misc. 3d 412, 418-19, 797 N.Y.S.2d 883 (Sup Ct, NY Co 2005)*.

Here, [*15] it is undisputed that the Agreement was signed as a condition of employment. In fact, when asked about the signing of the Agreement at his deposition, Barrett testified to the following:

Q: You wouldn't have given somebody a nondisclosure agreement unless you hired them, right?

A: I would not.

Q: Okay. So if he signed the nondisclosure agreement --

A: I was contemplating hiring him.

Q: You were contemplating?

A: Right. We had a separate agreement for the employment.

Q: You had a separate contract for his employment than the nondisclosure?

A: That's correct.

Q: Is it your testimony that Mr. Mironchik signed the nondisclosure contract before you actually hired him to do a job?

A: I believe that's correct.

Q: If Mr. Mironchik hadn't signed the nondisclosure agreement, you wouldn't **[**15]** have hired him; is that correct?

A: That is absolutely correct.

Q: At the meeting -- well, how did you --

A: I want to clarify. I would not have told him any information about what I do if he had not signed the nondisclosure agreement.

Q: Thank you. I understand. The question, though, was, you would not have hired him? Which clearly, you would not have, if --

A: I would not have spoken to him professionally.

Q: You wouldn't **[*16]** have told him anything about --

A: If I --

Q: Let me finish. I'm sorry. You wouldn't have talked with him about synthesizer programming unless he signed a nondisclosure agreement?

A: That's correct.

(Barrett Dep. 71:16-73:10, Aug 12, 2010.)

Mironchik also testified during his deposition that he had to sign the Agreement as a condition of his employment:

Q: So you understood that if you hadn't signed it - -

Mr. Mars: He's not done.

Q: - - if you hadn't signed this, then this information would not have been disclosed to you?

**[**16]** A: I would not have worked with your client, and I needed work at the time.

Q: Right. So?

* * (colloquy) * *

Q: So the question is, when you needed the work; is that correct?

A: Uh-huh.

Q: At the time?

A: Yes.

Q: And you signed this agreement knowing that my client would not have given you the work if you didn't sign the agreement?

A: It was a condition of employment.

Q: Okay. And you agreed to the conditions of employment in exchange for getting the employment?

A: Yes.

(Mironchik Dep. 148:24-150:13, Aug 13, 2010.)

It is also clear that the Agreement was part, of plaintiffs' "general plan . . . to forestall competition:"

Q: Would it be fair to say that you don't talk to anybody about **[*17]** synthesizer programming unless they sign a nondisclosure agreement?

Mr. Ben-Zvi: Well, can we have a time frame on this?

Mr. Mars: At the point in time that he hired Mr. Mironchik.

**[**17]** A: At that point in time, I was really interested in protecting the methods that I came up with, because I knew that, eventually, they were going to come out. People would learn just by performing on them and looking at the software. They'd be able to eventually figure out or maybe figure out for themselves sooner or later. But at that point in time, nobody had -- I had no competition. Nobody had figured out how to compete with me on that level.

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 23 of 32

2012 N.Y. Misc. LEXIS 3472, *17; 2012 NY Slip Op 31902(U), **17

Q: That's 2006?

A: So I -- yeah. So I was very interested in protecting what I knew. Now it's a different story.

(Barrett Dep. 73:1.1-74:11.)

Here, unlike the case in *BDO Seidman*, the facts and circumstances weigh against **_partial_** enforcement, since the **_covenant_** was imposed as a condition of defendant's initial employment, not in connection with a promotion to a position of responsibility or trust, and there is evidence that the Agreement was part of a general plan to forestall competition. Moreover, there is also evidence that plaintiffs imposed the covenant, in bad faith, **[*18]** when Barrett chose not to place a time limitation on the covenant (Barrett Dep. 108:2-9), despite knowing that the information he sought to protect would eventually become known in the industry. **[**18]** (Barrett Dep. 73:1 1-74:11.)[3]

Accordingly, defendant's motion for summary judgment dismissing the first cause of action is granted.

*Second Cause of Action - Accounting*[4]

"The existence of a fiduciary relationship is essential for a cause of action in equity for an accounting arising out of the contract between the parties." *Waldman v. Englishtown Sportswear, 92 AD2d 833, 835, 460 N.Y.S.2d 552 (1st Dep't 1983).*

_____

[3] The Court notes that defendant also argued that even if the Agreement could be partially enforced, the information and techniques that plaintiffs seek to protect from disclosure are not actually subject to protection because they were not actually secret. *See Leo Silfen, Inc. v. Cream, 29 NY2d 387, 392-93, 278 N.E.2d 636, 328 N.Y.S.2d 423 (1972)* (holding that in order for material or information imparted to an employee during the course of his or her employment to be entitled to trade secret protection, it must not be readily available through public sources).

Defendant also argues that even assuming this information was entitled to trade secret protection, there is no evidence that he shared or used that information when he was employed by Cohen to work on the Seattle and Broadway productions of *Young Frankenstein*. Furthermore, defendant argues that there is no evidence that he shared or used any of this information while working on any independent projects.

The Court, however, need not reach these **[*19]** issues since it has already found that the Agreement is overly broad and cannot be partially enforced.

[4] The Court notes that neither party specifically addressed this cause of action in their briefing.

**[**19]** Here, the Complaint fails to even allege the nature of the requisite fiduciary relationship, and the cause of action for an accounting must also fail because the Court has already held that the Agreement between the parties is not enforceable.

*Fourth Cause of Action - Violation of the Lanham Act*

Plaintiffs allege in paragraph 77 of the Complaint that "[d]efendant has violated [p]laintiffs' rights under the Lanham Act, *28 U.S.C. Section 1338* by unfairly competing with [p]laintiffs."

First of all, both the Complaint and the motion papers cite to *28 USC 1338* when referring to the Lanham Act. However, Title 28 of the United States Code **[*20]** deals with "Judiciary and Judicial Procedure" (*i.e.* jurisdiction) in cases concerning "patents, plant variety protection, copyrights, mask works, designs, trademarks, and unfair competition." The Lanham Trade-Mark Act or the Trademark Act of 1946, popularly referred to as the Lanham Act, is codified by *15 U.S.C. 1051 to 1072, 1091 to 1096, 1111 to 1127, 1141,* and *1141a to 1141n.*

Not only do plaintiffs fail to cite to a single section of the Lanham Act, they also fail to even argue that "unfair competition" is actionable under the Lanham Act. As pointed out by the *Court in [**20] Glenn v. Advertising Publications, Inc., 251 FSupp 889, 901 (SDNY 1966)*:

> **The Lanham Act relates to trade marks**. In its concluding sentence it refers to unfair competition. *15 U.S.C. § 1127* states: 'The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, **[*21]** counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.' The phrase 'to protect persons engaged in such commerce against unfair competition' inserted in the middle of this sentence does not, in and of itself, create a general federal law of unfair competition in interstate commerce. **This general language must be attributed to a particular section of the Act**.

(emphasis added) (internal citations omitted).

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 94

INDEX NO. 650620/2018
RECEIVED NYSCEF: 02/22/2019

19-01435-jlg   Doc 5-38   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit KK -
Aff. in Reply   Pg 24 of 32

2012 N.Y. Misc. LEXIS 3472, *21; 2012 NY Slip Op 31902(U), **20

Here, plaintiffs not only fail to delineate which section of the Lanham Act they may be relying on, but they also fail to even identify either a registered or unregistered trademark that plaintiffs may wish to protect from defendant's alleged unfair competition. Accordingly, the fourth cause of action for violation of the Lanham Act must be dismissed.

**[**21]** *Fifth Cause of Action - Tortious Interference with Prospective Business Relations*

The required elements of a cause of action for tortious interference with prospective business relations are as follows: (1) that plaintiff had a business relation **[*22]** with a third party; (2) that defendant knew of the relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper means to harm the plaintiff; and (4) that defendant's interference caused injury to the business relationship. *See Amaranth LLC v. J.P. Morgan Chase & Co., 71 AD3d 40, 47, 888 N.Y.S.2d 489 (1st Dep't 2009)*.

Defendant argues that this cause of action must be dismissed because when asked in his deposition about the basis of this claim, Barrett responded as follows:

Q: Okay. Take a look at Page 17 of your Verified Complaint.

A: Okay. Fifth cause of action?

Q: That's correct. Paragraph 83. It says, "Defendant has been and continues to directly and knowingly encourage Plaintiff's clients to no longer do business with Plaintiff or use Plaintiff's services."

Other than what you've testified here today, what evidence do you have that supports that claim?

**[**22]** A: I don't have knowledge of anything.

Q: Paragraph 84. "Defendant is intentionally interfering with Plaintiff's business opportunities with said clients."

Other than what you've testified to here today, what additional evidence do you have that supports that contention?

A: I would say it has to be **[*23]** characterized as conjecture.

(Barrett Dep. 212:9-213:4.)

When questioned on the same topic by his own attorney, Barrett offered this testimony:

Q: Mr. Barrett, do you recall the series of questions that were asked of you regarding the allegations of interference on the part of the Defendant in your contractual relations?

A: Yes.

Q: Do you recall your answer at the time to the

Defendant's attorney?

A: Yes.

Q: Now, is there any clarification that you want to make regarding your answer?

A: Yes.

Mr. Mars: I'm objecting to this line of testimony, being that he already answered it, and I think having a clarification to get your client to change his testimony is improper.

Mr. Ben-Zvi: Not to change his **[**23]** testimony. You were so effective that you battered him into an incorrect answer.

Mr. Mars: Oh, okay. Again, I'm asserting my objection for the record.

Q: You can answer.

A: There were several other instances that your client interfered with my business, where he violated the contract. And these involved use of an instrument called a muse receptor.

For instance, on a show called "In the Heights," I spoke to an orchestrator who worked on that show, and he confirmed that this muse receptor was used on the **[*24]** show. And a muse receptor is a computer as well, just as we've been discussing Windows-based computers, Apple, Macintosh-based computers. . . .

(Barrett Dep. 216:9-217:22.)

It is clear that plaintiffs cannot sustain a claim for tortious interference with prospective business relations. Aside from admitting that the allegations in the Complaint were based on conjecture, plaintiffs offer no other evidence to support their claim. In any event, plaintiffs failed to even allege that defendant acted out of malice or improper means, which is a required element of a claim for tortious interference with **[**24]** prospective business relations.

Accordingly, the fifth cause of action must be dismissed.

Counsel for both parties shall appear for a conference in IA Part 39, 60 Centre St - Room 208 on August 8, 2012 at 10:30am to discuss how they want to proceed with defendant's defamation counterclaims.

This constitutes the decision and order of this Court.

Dated: July 13, 2012

/s/ Barbara R. Kapnick

BARBARA R. KAPNICK

J.S.C.

2012 N.Y. Misc. LEXIS 3472, *24; 2012 NY Slip Op 31902(U), **24

**End of Document**

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM INDEX NO. 650620/2018

NYSCEF DOC. NO. 94    19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK - RECEIVED NYSCEF: 02/22/2019
Aff. in Reply    Pg 26 of 32

# EXHIBIT D

Cited

As of: February 22, 2019 6:14 PM Z

## *Noise Marketing LLC v Great Works America, Inc.*

Supreme Court of New York, New York County

April 28, 2009, Decided; April 29, 2009, Filed

Index No. 113772/08

**Reporter**

2009 N.Y. Misc. LEXIS 4709 *; 2009 NY Slip Op 30965(U) **

 [**2]  NOISE MARKETING LLC, Plaintiff, -against- GREAT WORKS AMERICA, INC., ZOE TURNBULL and KRISTA FREIBAUM, Defendants.

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS

## Core Terms

cause of action, allegations, employment agreement, defendants', *__confidential__*, *__confidential information__*, business relationship, breach of contract, breach of fiduciary duty, motion to dismiss, subcontracted, competitor, marketing, public relations, strategies, proprietary information, unjust enrichment, trade secret, parties, solicit, Hire, complaint alleges, transactions, occurrences, conclusory, services, utilized, damages, amend

**Judges:**  [*1] Jane S. Solomon, J.S.C.

**Opinion by:** Jane S. Solomon

## Opinion

### DECISION and ORDER

**Solomon, J.:**

In this action, plaintiff Noise Marketing LLC (Noise) seeks damages from all defendants for the alleged improper use of *__confidential__* and proprietary *__information__* by defendants Zoe Turnbull (Turnbull) and Krista Freibaum (Freibaum) in violation of their employment agreements with it. The six-count amended complaint asserts causes of action for breach of contract, breach of fiduciary duty and the duty of good faith and fair dealing, tortious interference with prospective contract and business relationships, aiding and abetting breach of fiduciary duty, and quantum meruit and unjust enrichment. Defendants now move to dismiss the complaint based upon documentary evidence and for failure to state a cause of action.

### Facts

Noise is a company specializing in marketing, advertising and public relations campaigns for corporations.  [**3] Noise alleges that, pursuant to employment agreements dated May 26, 2006 and February 15, 2008, both of which are submitted, Turnbull was employed as its Senior Director of Public Relations. In this position, Turnbull worked with Noise's high-level clients, including those that subcontracted work to  [*2] Noise, and obtained access to the *__confidential__* and proprietary *__information__* of Noise and its clients. Freibaum allegedly joined Noise in February 2007 as a Public Relations Associate, pursuant to an employment agreement, and she signed a second employment agreement, dated February 2, 2008, which Noise submits. Freibaum worked under Turnbull, giving her access to much of the same sensitive and proprietary information as was available to Turnbull.

The Turnbull and Freibaum agreements contained similar provisions requiring Turnbull and Freibaum to "hold all Trade Secrets of COMPANY in confidence" and defining "Trade Secrets" as "the information described in the Description of Trade Secrets (Attachment B) and any other information that from time to time may be identified by NOISE as confidential or is otherwise known to you as being confidential" (Geisler Aff., Ex. A; Berke Aff., Exs. D and E). Freibaum's February 2, 2008 employment agreement contains the "Description of Trade Secrets" from Attachment B, which includes "[m]arketing plans and strategies of NOISE, including information pertaining to prospective customers"  [**4] (Geisler Aff., Ex. A). The agreements also require Turnbull and Freibaum  [*3] to keep "Proprietary Information in strict confidence and trust" (Berke Aff., Ex. D; Geisler Aff., Ex. A).

Non-party Absolut Spirits Company, Inc. (Absolut) was a client of defendant Great Works America, Inc. (Great Works).

From December 2007 through July 2008, Great Works subcontracted Absolut's online public relations strategy and marketing work to Noise. While the subcontracts, copies of which are submitted, do not contain a non-compete clause or other restrictive covenant, they did include "Work For Hire" and "Confidentiality" provisions (Berke Aff., Exs. B and C). The "Work For Hire" provision stated that "Great Works shall be the owner of all of the results and proceeds of Noise's services" and Noise agreed that, "[i]n the event that any of proceeds of Noise's work are not considered a work for hire, then Noise's copyright to such work is hereby assigned to Great Works in perpetuity" (*id.*).

Turnbull and Freibaum allegedly worked closely with both Great Works and Absolut on the subcontract work and, Noise contends, Absolut then decided to work directly with Noise (although Noise claims that it never pitched Absolut to move from Great Works). Noise claims that Great Works knew of, **[*4]** and approved, Absolut's decision to work directly with Noise. In July 2008, a one year agreement was drafted and circulated between Noise and Absolut, but apparently not signed.

**[**5]** Noise alleges that Great Works then set upon a course of conduct to take back the Absolut account even though Great Works lacked expertise in online public relations strategies and marketing work. To this end, Great Works allegedly met with and convinced Turnbull to leave Noise and work for it, and to solicit Freibaum to join her. During these meetings, Great Works allegedly received Noise's proprietary and ___*confidential* *information*___ from Turnbull. Turnbull allegedly accepted employment with Great Works, and thereafter solicited Freibaum to join Great Works. Noise claims that Turnbull and Freibaum's close work with Noise clients enabled them to "leverage[] extensive proprietary and ___*confidential*___ Noise ___*information*___ in support of the Absolut work" (Complaint, P 29) in breach of their employment agreements, allowing Great Works to interfere with Noise's proposed agreement with Absolut.

To the extent that additional facts are necessary to the resolution of defendants' motion, those facts are stated in the discussion **[*5]** below.

Discussion

Breach of Contract (First Cause of Action)

Defendants seek dismissal of the first cause of action for breach of contract--based upon Turnbull's solicitation of Freibaum, arguing that it is based solely upon conclusory allegations.

**[**6]** The elements of a cause of action for breach of contract are: (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, and (4) resulting damage (*Furia v Furia, 116 AD2d 694, 498 N.Y.S.2d 12 [2d Dept 1986])*. A cause of action for breach of contract "must allege the provisions of the contract upon which the claim is based" (*Atkinson v Mobil Oil Corp., 205 AD2d 719, 720, 614 N.Y.S.2d 36 [2d Dept 1994]* [citation omitted]), and the complaint "must be sufficiently particular to give the court and [the] parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved as well as the material elements of each cause of action or defense" (*id.* [internal quotation marks and citation omitted]). "[V]ague and conclusory allegations are insufficient to sustain a breach of contract cause of action" (*Gordon v Dino De Laurentiis Corp., 141 AD2d 435, 436, 529 N.Y.S.2d 777 [1st Dept 1988])*.

Here, **[*6]** the complaint identifies the non-solicitation provision contained in the employment agreements, and defendants themselves submit copies. Turnbull's employment agreements contain the following language:

> While employed by the COMPANY and for a period of one (1) year after termination of such employment for any reason whatsoever (whether voluntary or involuntary) you will not, directly or indirectly, solicit, recruit or hire any employee of the COMPANY to work for a third party other than the COMPANY or engage in any activity that would cause any **[**7]** employee to violate any agreement with the COMPANY

(Berke Aff., Exs. D and E). The complaint alleges that Turnbull breached this provision by soliciting Freibaum, damaging Noise. Therefore, Noise properly has stated this cause of action.

Citing *Murphy v Sheldon (13 Misc 3d 1223[A], 2006 NY Slip Op 51959[U], 831 N.Y.S.2d 348, 2006 WL 2955926, *3 [Sup Ct, Nassau County 2006])*, defendants' argument focuses on Noise's purported failure to "particularize the manner" in which Turnbull breached the non-solicitation provision. At this juncture, the allegations of the complaint are sufficiently particular to notify the court and defendants of the transactions and occurrences **[*7]** intended to be proved and the material elements of the cause of action. For the foregoing reasons, defendants' motion to dismiss the first cause of action is denied.

Breach of Contract (Second Cause of Action)

The second cause of action is based upon breaches of the confidentiality provisions of the employment agreements.

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 29 of 32

2009 N.Y. Misc. LEXIS 4709, *7; 2009 NY Slip Op 30965(U), **7

Defendants argue that this cause of action should be dismissed for failure to identify the **_confidential information_** imparted to defendants and how the alleged breach caused damages.

In support of their argument, defendants rely upon *Gordon (141 AD2d 435, 529 N.Y.S.2d 777, supra)*; the parties there allegedly entered into a joint venture to purchase a subsidiary of the Coca-Cola Company after the plaintiff was unable to purchase the company **[**8]** itself. The confidentiality agreement required each party to refrain from using **_confidential information_** obtained from the other, during any unilateral negotiations with the Coca-Cola Company. The First Department determined that the pleading alleged "in boilerplate fashion that defendant disclosed **_confidential information_** to Coca-Cola and that as a consequence plaintiffs were damaged in the sum of $ 35 million" (*id. at 436*). The Court held that these **[**8]** allegations were "vague and conclusory" and "insufficient to sustain a breach of contract cause of action" (*id.*).

The Court's holding was based on the fact that the plaintiffs had "not identified any **_confidential information_** imparted to defendant other than the specifics of their prior proposal to Coca-Cola and the financial due diligence with respect to [the target company]" (*id.*). The Court reasoned that the information could not "be classified as confidential or secret since it was already in Coca-Cola's possession before plaintiffs disclosed it to defendant" (*id.*). The Court also held that the complaint failed to "demonstrate how the defendant's alleged breach of the confidentiality agreement caused plaintiffs any injury" and contained "only boilerplate allegations of damage" (*id.*).

Unlike *Gordon*, here there is no indication that the alleged **_confidential information_** was already in Great Works' **[**9]** possession. Moreover, Noise alleges that it was injured because defendants' actions took away Noise's business. The essence of Noise's claim is that Turnbull and Freibaum's association with Noise enabled them to begin working with Great Works. Great Works allegedly did not provide the same **[**9]** services as Noise. While Noise had expertise in online public relations strategies and marketing, Great Works did not, and Turnbull and Freibaum brought their Noise-acquired services, including the strategies and processes described in their employment agreements, to Great Works.

In his affidavit, Erik Geisler (Geisler), Chief Strategy Officer for Noise, sets forth at length the ways in which Turnbull and Freibaum "are performing the same work they were to perform for [Noise] on the Absolut account for Great Works" (Geisler Aff., P 30). Among other things, he states that "Noise has created strategies and underlying concepts that are unique

and distinct to the advertising industry" and that Turnbull and Freibaum "learned how Noise worked with similar projects with other clients on similar programs," thereby learning "how Noise crafted online marketing and public relations strategies that would support and integrate successfully with advertising campaigns, marketing programs, and other media to create consumer awareness in ways that traditional tactics and competitive agencies could not achieve". The work allegedly **[**10]** "requested by Absolut from Noise, and the agreement in place, was for **[*10]** a set of projects different than that which Great Works had previously subcontract the work to Noise".

These allegations are not vague and conclusory. Nor are they boilerplate allegations that do not demonstrate how defendants' breach caused injury. Contrary to defendants' arguments, at this juncture, giving Noise the benefit of every favorable inference, these allegations sufficiently identify the **_confidential information_** imparted to Great Works by Turnbull and Freibaum, and how the alleged breach caused damages to Noise. In short, the allegations of the complaint are sufficient to put defendants on notice of the acts or conduct complained of, the **_confidential information_** that was purportedly utilized by Great Works, and how it was allegedly used (see *CPLR 3013* ["pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense"]).

Defendants argue that the "Work For Hire" provision of the Subcontracts negates any inference of wrongdoing, because all work for Absolut belonged to Great Works, not Noise. However, as **[*11]** discussed above, Noise claims that "[t]he work requested by Absolut from Noise . . . was for a set of projects different than that which Great Works had previously subcontracted the work to **[**11]** Noise" (Geisler Aff., P 23). Therefore, this argument is unpersuasive.

Defendants also argue that the absence of any non-compete provision in the employment agreements negates any inference of wrongdoing by defendants. However, Noise's claim is based upon Turnbull and Freibaum's alleged failure to hold Noise's trade secrets and proprietary and **_confidential information_** in confidence, and their purported appropriation of the strategies utilized by Noise to create the final product for Absolut. Therefore, this argument also is unpersuasive. For the foregoing reasons, defendants' motion to dismiss the second cause of action is denied.

Breach of Fiduciary Duty (Third Cause of Action) and Aiding and Abetting (Fifth Cause of Action)

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM                    INDEX NO. 650620/2018
NYSCEF DOC. NO. 94                                                  RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
                             Aff. in Reply    Pg 30 of 32                  Page 4 of 6

2009 N.Y. Misc. LEXIS 4709, *11; 2009 NY Slip Op 30965(U), **11

Defendants argue that the cause of action for breach of *fiduciary* duty should be dismissed as *duplicative* of the *breach* of *contract* claim.

"A cause of action for breach of *fiduciary* duty which is merely *duplicative* of a *breach* of *contract* claim cannot stand" (*William Kaufman Org., Ltd. v Graham & James LLP 269 AD2d 171, 173, 703 N.Y.S.2d 439 [1st Dept 2000]*; [*12] *see also* *Kaminsky v FSP Inc., 5 AD3d 251, 252, 773 N.Y.S.2d 292 [1st Dept 2004]* [granting motion to dismiss claim for breach of fiduciary duty for failure "to allege conduct by defendants in breach of a duty other than, and independent of, that contractually established between the parties"]). Moreover, a [**12] cause of action for breach of the implied covenant of good faith and fair dealing will be dismissed if it is redundant of a cause of action for breach of contract (*Business Networks of N.Y., Inc. v Complete Network Solutions Inc., 265 AD2d 194, 195, 696 N.Y.S.2d 433 [1st Dept 1999]*).

Here, the complaint alleges that "Turnbull and Freibaum knew that clients imparted to Noise information that would otherwise be unavailable to the public" (Complaint, P 55), and they allegedly "knew that the information they gained as employees of Noise, with respect to the Absolut account and other work of Noise, would assist Noise's competitor, Great Works" (*id.*, P 56). Noise claims that, because of their status as Noise employees, Turnbull and Freibaum "were provided with information as to how Noise created and continued with its successful business - information which would be a valuable asset to any competitor" (*id.*). According to [*13] Noise, "Turnbull and Freibaum had a duty, while employed by Noise, to act only in the best interest of Noise and to not utilize information at their disposal, while employed by Noise, and thereafter, for the personal benefit of themselves and their new employer, Great Works" (*id.*, P 57).

However, as discussed above, Noise's second cause of action is based upon Turnbull and Freibaum's alleged knowing violation of "their contractual obligations when they took from [**13] Noise *confidential* and proprietary *information*" (*id.*, P 50) and "utilized such proprietary information for their benefit and to the detriment of Noise" (*id.*, P 51). Thus, the conduct relating to breach of duties alleged in Noise's third cause of action for breach of fiduciary duty is no different from the conduct relating to defendants' alleged breach of contract. Moreover, to the extent that Noise's third cause of action asserts a claim for violating a duty of good faith and fair dealings, that claim is also redundant of Noise's claim for breach of contract. Accordingly, defendants' motion to dismiss Noise's third cause of action is granted.

Noise's fifth cause of action claims that Great Works assisted Turnbull and Freibaum's [*14] breach of fiduciary duty. However, "[b]ecause the breach of fiduciary duty claim fails, there can be no cause of action for aiding and abetting breach of that fiduciary duty" (*Kassover v Prism Venture Partners, LLC, 53 AD3d 444, 449, 862 N.Y.S.2d 493 [1st Dept 2008]*). Accordingly, defendants' motion to dismiss the fifth cause of action is granted.

Tortious Interference (Fourth Cause of Action)

Defendants argue that the fourth cause of action should be dismissed for failure to allege malice and wrongful means. Noise counters that Great Works acted with malice. Noise also argues that wrongful means are required only where the parties are direct competitors, and that Great Works and Noise were not [**14] competitors, because "[p]rior to their nefarious conduct, Great Works did not perform the services that Absolut required" (Noise Opp. Mem. of Law, at 16).

A cause of action for tortious interference with prospective business relations requires: "(a) business relations with a third party; (b) the defendant's interference with those business relations; (c) [that] the defendant act[ed] with the sole purpose of harming the plaintiff or using wrongful means; and (d) injury to the business relationship" (*Advanced Global Tech. LLC v Sirius Satellite Radio, Inc., 15 Misc 3d 776, 779, 836 N.Y.S.2d 807 [Supt Ct, NY County]*, [*15] *affd* *44 AD3d 317, 843 N.Y.S.2d 220 [1st Dept 2007]*). "'Wrongful means' includes physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; [it does] not, however, include persuasion alone[,] although it is knowingly directed at interference with the contract" (*Guard-Life Corp. v S. Parker Hardware Mfg. Corp., 50 NY2d 183, 191, 406 N.E.2d 445, 428 N.Y.S.2d 628 [1980]*). "[I]t must be alleged that the conduct by defendant that allegedly interfered with plaintiff's prospects either was undertaken for the sole purpose of harming plaintiff, or that such conduct was wrongful or improper independent of the interference allegedly caused thereby" (*Jacobs v Continuum Health Partners, Inc., 7 AD3d 312, 313, 776 N.Y.S.2d 279 [1st Dept 2004]*).

Here, the fourth cause of action alleges that [**15] defendants knew of "Noise's contractual and/or prospective business relationship with Absolut and Noise's expectancy to incur a *financial benefit* from the contractual and/or prospective business relationship" (Complaint, P 60, at 10 [emphasis added]). Defendants allegedly intended "to divert the transaction and business away from Noise and to Great Works," and "[t]hey did so in an improper manner" (*id.*, P 54, at 11). [*16] The complaint acknowledges the "highly

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM INDEX NO. 650620/2018

NYSCEF DOC. NO. 34                                                                    RECEIVED NYSCEF: 02/22/2019

19-01435-jlg    Doc 5-38    Filed 12/23/19    Entered 12/23/19 16:01:58    Exhibit KK -
Aff. in Reply    Pg 31 of 32                                                              Page 5 of 6

2009 N.Y. Misc. LEXIS 4709, *16; 2009 NY Slip Op 30965(U), **15

competitive nature of the marketing field," and avers that, "[i]n this instance, the Defendants improperly took Noise's proprietary tactics and marketing expertise and utilized it for the benefit of themselves" (Complaint, P 30). Noise claims that "Great Works set upon a course of conduct to take back the [Absolut] account" from Noise (*id.*, P 32), and that, but for defendants' actions, Noise "would have received the anticipated *economic advantage* of the agreement and/or prospective business relationships with Absolut," but instead, "the benefit of the prospective transaction and future business has been wrongly, and intentionally, diverted from Noise to Defendants" (*id.*, P 55 [emphasis added]).

Other than Noise's conclusory allegations of improper conduct, nothing contained in the complaint alleges that Great Works acted with malice or wrongful means, or that its efforts to hire Turnbull and Freibaum were intended solely to injure Noise, without any other legitimate purpose. Indeed, based upon the **[\*\*16]** allegations of the complaint, Noise and Great Works were competing for the same business, with Great Works motivated, at least in part, by its own economic **[\*17]** interest in attempting to keep the work that it had subcontracted to Noise in servicing Absolut (*Phoenix Capital Inv. v Ellington Mgt. Group*, 2007 WL 4101654, 2007 NY Slip Op 33650[U] [Sup Ct, NY County], *affd as modified* 51 AD3d 549, 859 N.Y.S.2d 46 [1st Dept 2008] [dismissing cause of action for tortious interference with prospective business relationship where, because the "allegations suggest that [defendant's] self-interest motivated its alleged conduct, at least in part, [plaintiff] cannot assert that [defendant] acted 'solely out of malice'"] [citation omitted]).

Noise's argument that it was not in competition with Great Works is without merit. As a preliminary matter, while "[t]he existence of competition may often be relevant, since it provides an obvious motive for defendant's interference other than a desire to injure the plaintiff" (*Advanced Global Tech., 15 Misc 3d at 780*), "as long as the defendant is motivated by legitimate economic self-interest, it should not matter if the parties are or are not competitors in the same marketplace" (*Carvel Corp. v Noonan, 3 NY3d 182, 191, 818 N.E.2d 1100, 785 N.Y.S.2d 359 [2004]*).

In any event, this argument is contradicted by the allegations of the complaint. Specifically, the complaint **[\*18]** alleges that Noise and Great Works were both marketing companies **[\*\*17]** (Complaint, PP 6, 19); that "Turnbull breached the terms of her employment agreement by soliciting Freibaum to leave Noise and work for *a direct competitor*" (Complaint, P 47 [emphasis added]); that "Turnbull and Freibaum knew that the information they gained as employees of Noise, with respect to the Absolut account and other work of Noise, would assist *Noise's competitor, Great Works,*" and that

Turnbull and Freibaum were provided with "information which would be a valuable asset *to any competitor*" (*id.*, P 56, at 10 [emphasis added]). As a result, the motion to dismiss the fourth cause of action is granted.

## Quantum Meruit and Unjust Enrichment (Sixth Cause of Action)

Defendants argue that Noise fails to allege the elements of quantum meruit and unjust enrichment. Plaintiff counters that it has stated a claim for unjust enrichment, but does not oppose dismissal of the claim for quantum meruit. Therefore, the court addresses only the claim for unjust enrichment, which requires a showing that "a benefit was bestowed upon the property by plaintiff[] and that defendants will obtain such benefit without adequately compensating **[\*19]** plaintiffs therefor" (*Tarrytown House Condominiums, Inc. v Hainje, 161 AD2d 310, 313, 555 N.Y.S.2d 83 [1st Dept 1990]*).

Here, the complaint alleges that "Defendants should not be permitted, in any equitable fashion, to walk away from the transaction with Absolut's money in their bank accounts that was **[\*\*18]** misdirected from Noise" (Complaint, P 63). Thus, Noise's unjust enrichment claim appears to be premised upon its potential contract with Absolut, not that it bestowed a benefit on Great Works for which it has not been properly compensated. Therefore, defendants' motion to dismiss this cause of action is granted.

## Leave to Replead or Amend

In its opposition papers, Noise requests that, if any claim is insufficient, it be granted leave to replead, amend or supplement those causes of action. Noise also seeks leave to amend to add claims of unfair competition and misappropriation of trade secrets.

Under *CPLR 3025 (b)*, leave to amend a pleading will be freely granted "in the absence of prejudice or unfair surprise" (*Aetna Cas. and Sur. Co. v LFO Constr. Corp., 207 AD2d 274, 277, 615 N.Y.S.2d 389 [1st Dept 1994]*), but "not granted upon mere request without a proper showing. Rather, in determining whether to grant leave to amend, **[\*20]** a court must examine the underlying merit of the causes of action asserted . . ." (*Wieder v Skala, 168 AD2d 355, 355, 563 N.Y.S.2d 76 [1st Dept 1990]*). Here, Noise submits no proposed amended pleading nor explains how it might do so. The request thus is denied.

Accordingly, it is hereby

ORDERED that the motion to dismiss is granted to the extent

FILED: NEW YORK COUNTY CLERK 02/22/2019 04:30 PM
NYSCEF DOC. NO. 94

INDEX NO. 650620/2018
RECEIVED NYSCEF: 02/22/2019

19-01435-jlg   Doc 5-38   Filed 12/23/19   Entered 12/23/19 16:01:58   Exhibit KK -
Aff. in Reply   Pg 32 of 32

Page 6 of 6

2009 N.Y. Misc. LEXIS 4709, *20; 2009 NY Slip Op 30965(U), **18

that the third, fourth, fifth and sixth causes of action of the complaint are dismissed, and the motion is otherwise **[\*\*19]** denied; and it further is

ORDERED that defendants are directed to serve an answer to the complaint within 20 days after service of a copy of this order with notice of entry; and it further is

ORDERED that counsel shall appear for a preliminary conference in Part 55 on June 22, 2009 at 12 noon.

Dated: April 28, 2009

ENTER:

/s/ Jane S. Solomon

J.S.C.

JANE S. SOLOMON

---

**End of Document**